## TOLLETT, WARDEN v. HENDERSON

No. 72–95.   Argued February 20, 1973—Decided April 17, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined.   MARSHALL, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post*, p. 269.

*R. Jackson Rose,* Assistant Attorney General of Tennessee, argued the cause for petitioner.   With him on the brief were *David M. Pack,* Attorney General, and *Bart C. Durham III* and *William C. Koch,* Assistant Attorneys General.

*H. Fred Hoefle,* by appointment of the Court, 409 U. S. 1004, argued the cause and filed a brief for respondent.*

---

*\*Evelle J. Younger,* Attorney General, *Edward A. Hinz, Jr.,* Chief Assistant Attorney General, *Doris H. Maier* and *Edward P. O'Brien,* Assistant Attorneys General, and *Gloria F. DeHart,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae* urging reversal.

*Jack Greenberg, James M. Nabrit III,* and *Charles Stephen Ralston* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae,* urging affirmance.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Twenty-five years ago respondent was indicted for the crime of first-degree murder by a grand jury in Davidson County, Tennessee. On the advice of counsel, he pleaded guilty and was sentenced to a term of 99 years in prison. Many years later he sought habeas corpus in both state and federal courts. In one petition in United States District Court, he contended that a confession he had given to the police had been coerced, and that he had been denied the effective assistance of counsel. The District Court considered these claims and decided them adversely to respondent, the Court of Appeals for the Sixth Circuit affirmed without opinion, and this Court denied certiorari. *Henderson* v. *Henderson*, 391 U. S. 927 (1968). Respondent then sought state habeas corpus, alleging for the first time that he was deprived of his constitutional right because Negroes had been excluded from the grand jury which indicted him in 1948. After a series of proceedings in the Tennessee trial and appellate courts, the Tennessee Court of Criminal Appeals ultimately concluded that respondent had waived his claim by failure to raise it before pleading to the indictment, and by pleading guilty.

Respondent then filed in the United States District Court the petition for habeas corpus which commenced the present litigation, asserting the denial of his constitutional right by reason of the systematic exclusion of Negroes from grand jury service. Petitioner, in effect, conceded such systematic exclusion to have existed, and the District Court so found. The issue upon which the District Court and the Court of Appeals focused was whether respondent's failure to object to the indictment within the time provided by Tennessee law constituted

a waiver of his Fourteenth Amendment right to be indicted by a constitutionally selected grand jury.

At a state hearing, respondent testified that his lawyer did not inform him of his constitutional rights with respect to the composition of the grand jury, that he did not know how the grand jury was selected or that Negroes were systematically excluded, and that his attorney did not tell him that he could have challenged the indictment, or that failure to challenge it would preclude him from later raising that issue. An unchallenged affidavit submitted by the attorney who represented respondent in the 1948 criminal proceeding stated that counsel did not know as a matter of fact that Negroes were systematically excluded from the Davidson County grand jury, and that therefore there had been no occasion to advise respondent of any rights he had as to the composition or method of selection of that body.

On the basis of this evidence, the Court of Appeals held that the record demonstrated no such "waiver" of constitutional rights as that term was defined in *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938)—"an intentional relinquishment or abandonment of a known right or privilege." The Court of Appeals went on to affirm the judgment of the District Court, which had ordered respondent released from custody because Negroes had been excluded from the grand jury which indicted him for the offense in question. We granted certiorari in order to decide whether a state prisoner, pleading guilty with the advice of counsel, may later obtain release through federal habeas corpus by proving only that the indictment to which he pleaded was returned by an unconstitutionally selected grand jury.[1]

---

[1] In *Parker* v. *North Carolina,* 397 U. S. 790, 798 (1970), the Court said: "Whether the question of racial exclusion in the selection of the grand jury is open in a federal habeas corpus action we need not

## I

Respondent, a Negro, and two others were arrested by Tennessee authorities for the robbery of a Nashville liquor store and the attempted murder of an employee who was shot during the episode. Three weeks later the employee died, and a Davidson County grand jury subsequently returned a murder indictment against respondent. Respondent signed a confession admitting his involvement in the robbery and shooting.

At the time of his arrest, respondent was 20 years old and his formal education had terminated at the sixth grade level. He had no attorney when he signed the confession, but subsequently his mother retained counsel to represent him. The attorney's major effort appears to have been to arrange a form of plea bargain, whereby respondent would plead guilty to the murder charge and the sentence, although imposed by a petit jury, would be 99 years, rather than the ultimate penalty. Respondent initially expressed a desire to plead not guilty, but, apparently because of the evidence against him and the possibility that the death sentence might be imposed if he were convicted, he decided on the advice of his counsel to plead guilty. The plea was entered, and the agreed-upon sentence was imposed.

## II

For nearly a hundred years it has been established that the Constitution prohibits a State from systematically excluding Negroes from serving upon grand juries that indict for crime and petit juries that try the factual issue of the guilt or innocence of the accused. *Strauder* v.

---

decide," citing three decisions of the courts of appeals. All of these decisions dealt with the issue of whether grand jury exclusion might be raised on federal habeas after a plea of not guilty and trial by jury. That issue is left open by this opinion, as it was by *Parker.*

*West Virginia,* 100 U. S. 303, 309 (1880). See also *Virginia* v. *Rives,* 100 U. S. 313, 322–323 (1880). These holdings have been reaffirmed over the years, see, *e. g., Norris* v. *Alabama,* 294 U. S. 587 (1935), and *Pierre* v. *Louisiana,* 306 U. S. 354 (1939), and are not of course questioned here. But respondent's assertion of this claim has another dimension to it; it was made for the first time many years after he had pleaded guilty to the offense for which he was indicted by the grand jury. None of our previous decisions dealing with the constitutional prohibition against racial discrimination in the selection of grand jurors has come to us in the context of a guilty plea.[2]

In *Brady* v. *United States,* 397 U. S. 742, 750 (1970), *McMann* v. *Richardson,* 397 U. S. 759, 770 (1970), and *Parker* v. *North Carolina,* 397 U. S. 790 (1970), this Court dealt at some length with the effect of a plea of guilty on the later assertion of claimed violations of constitutional

---

[2] Cf. *Alexander* v. *Louisiana,* 405 U. S. 625 (1972); *Sims* v. *Georgia,* 389 U. S. 404 (1967); *Jones* v. *Georgia,* 389 U. S. 24 (1967); *Whitus* v. *Georgia,* 385 U. S. 545 (1967); *Coleman* v. *Alabama,* 377 U. S. 129 (1964); *Arnold* v. *North Carolina,* 376 U. S. 773 (1964); *Eubanks* v. *Louisiana,* 356 U. S. 584 (1958); *Reece* v. *Georgia,* 350 U. S. 85 (1955); *Williams* v. *Georgia,* 349 U. S. 375 (1955); *Hernandez* v. *Texas,* 347 U. S. 475 (1954); *Avery* v. *Georgia,* 345 U. S. 559 (1953); *Cassell* v. *Texas,* 339 U. S. 282 (1950); *Patton* v. *Mississippi,* 332 U. S. 463 (1947); *Akins* v. *Texas,* 325 U. S. 398 (1945); *Hill* v. *Texas,* 316 U. S. 400 (1942); *Smith* v. *Texas,* 311 U. S. 128 (1940); *Pierre* v. *Louisiana,* 306 U. S. 354 (1939); *Hale* v. *Kentucky,* 303 U. S. 613 (1938); *Hollins* v. *Oklahoma,* 295 U. S. 394 (1935); *Norris* v. *Alabama,* 294 U. S. 587 (1935); *Martin* v. *Texas,* 200 U. S. 316 (1906); *Rogers* v. *Alabama,* 192 U. S. 226 (1904); *Tarrance* v. *Florida,* 188 U. S. 519 (1903); *Carter* v. *Texas,* 177 U. S. 442 (1900); *Williams* v. *Mississippi,* 170 U. S. 213 (1898); *Gibson* v. *Mississippi,* 162 U. S. 565 (1896); *Bush* v. *Kentucky,* 107 U. S. 110 (1883); *Neal* v. *Delaware,* 103 U. S. 370 (1881); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880).

rights.  In *Brady* v. *United States, supra,* at 750, 758, the Court said:

> "The State to some degree encourages pleas of guilty at every important step in the criminal process.  For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment.  For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt.  In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family.  All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction.
>
> .      .      .      .      .
>
> "This mode of conviction is no more foolproof than full trials to the court or to the jury.  Accordingly, we take great precautions against unsound results, and we should continue to do so, whether conviction is by plea or by trial.  We would have serious doubts about this case if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood that defendants, advised by competent counsel, would falsely condemn themselves.  But our view is to the contrary and is based on our expectations that courts will satisfy themselves that pleas of guilty are voluntarily and intelligently made by competent defendants with adequate advice of counsel and that there is nothing to question the accuracy and reliability of the defendants' admissions that

they committed the crimes with which they are charged. In the case before us, nothing in the record impeaches Brady's plea or suggests that his admissions in open court were anything but the truth."

In *McMann* v. *Richardson, supra*, at 770–771, the Court laid down the general rule by which federal collateral attacks on convictions based on guilty pleas rendered with the advice of counsel were to be governed:

"In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." (Footnote omitted.)

The Court of Appeals in its opinion in this case expressed the view that *Brady, supra,* and *McMann, supra,* were not controlling, because, in its words:

"The *Brady* line of cases dealt only with challenges to the guilty plea itself; no such challenge has been made here. For this reason alone we believe that *Brady* and its successors cannot govern our decision here." 459 F. 2d 237, 242 n. 5 (1972).[3]

---

[3] A recent decision of the Fourth Circuit, *Parker* v. *Ross,* 470 F. 2d 1092 (1972), arrived at the conclusion we now reach by extending the reasoning of the *Brady* trilogy to the type of claim respondent seeks to assert.

The second sentence of the quoted passage does not appear in the cited report. It is contained, however, in the official opinion as issued by the Clerk of Court for the Sixth Circuit.

We think the Court of Appeals took too restrictive a view of our holdings in the *Brady* trilogy. In each of those cases the habeas petitioner alleged some deprivation of constitutional rights that preceded his decision to plead guilty. In *McMann, supra,* each of the respondents asserted that a coerced confession had been obtained by the State. In *Brady, supra,* the claim was that the burden placed on the exercise of the right to jury trial by the structure of the Federal Kidnaping Act, 18 U. S. C. § 1201—a burden which was held constitutionally impermissible in *United States* v. *Jackson,* 390 U. S. 570 (1968)—had motivated petitioner's decision to plead guilty. In *Parker, supra,* the claim was that a provision of that State's laws similar to that contained in 18 U. S. C. § 1201 had likewise motivated the guilty plea.

While the claims of coerced confessions extracted prior to the guilty plea in *McMann* were in a somewhat different posture than had they been made in attacking a jury verdict based in part upon such confessions, the claim of impermissible burden on the right to jury trial resulting from the structure of the Kidnaping Act and the North Carolina law, respectively, were not significantly different from what they would have been had they been made following a bench trial and judgment of conviction. But the Court in *Brady* and *Parker,* as well as in *McMann,* refused to address the merits of the claimed constitutional deprivations that occurred prior to the guilty plea. Instead, it concluded in each case that the issue was not the merits of these constitutional claims as such, but rather whether the guilty plea had been made intelligently and voluntarily with the advice of competent counsel.

There are no doubt factual and legal differences between respondent's present assertion of the claim of discriminatory selection of the members of a grand jury, and the assertion of the constitutional claims by the

prisoners in the *Brady* trilogy. In the latter cases, the facts giving rise to the constitutional claims were generally known to the defendants and their attorneys prior to the entry of the guilty pleas, and the issue in this Court turned on the adequacy of the attorneys' advice in evaluating those facts as a part of the recommendation to plead guilty. In the instant case, the facts relating to the selection of the Davidson County grand jury in 1948 were found by the District Court and the Court of Appeals to have been unknown to both respondent and his attorney. If the issue were to be cast solely in terms of "waiver," the Court of Appeals was undoubtedly correct in concluding that there had been no such waiver here. But just as the guilty pleas in the *Brady* trilogy were found to foreclose direct inquiry into the merits of claimed antecedent constitutional violations there, we conclude that respondent's guilty plea here alike forecloses independent inquiry into the claim of discrimination in the selection of the grand jury.

## III

We hold that after a criminal defendant pleads guilty, on the advice of counsel, he is not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected. The focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity. A state prisoner must, of course, prove that some constitutional infirmity occurred in the proceedings. But the inquiry does not end at that point, as the Court of Appeals apparently thought. If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases," *McMann* v. *Richardson, supra,* at 771. Counsel's failure to evaluate

properly facts giving rise to a constitutional claim, or his failure properly to inform himself of facts that would have shown the existence of a constitutional claim, might in particular fact situations meet this standard of proof. Thus, while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief.

We thus reaffirm the principle recognized in the *Brady* trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*.

A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry. And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, *McMann, supra,* it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings.

The principal value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability

to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client, and such representation frequently involves highly practical considerations as well as specialized knowledge of the law. Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, see *Brady* v. *United States, supra,* at 751–752, or by contesting all guilt, see *Santobello* v. *New York,* 404 U. S. 257 (1971). A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement, such as unconstitutional grand jury selection procedures, might be factually supported.

In order to obtain his release on federal habeas under these circumstances, respondent must not only establish the unconstitutional discrimination in selection of grand jurors, he must also establish that his attorney's advice to plead guilty without having made inquiry into the composition of the grand jury rendered that advice outside the "range of competence demanded of attorneys in criminal cases."

Because we do not have before us all of the papers dealing with respondent's previous federal habeas petitions, we are not in a position to say whether he is presently precluded from raising the issue of the voluntary and intelligent nature of his guilty plea, or whether that claim would be open to him on appropriate allegations in a new or amended petition. The Court of Appeals was at pains to point out that respondent's present petition did not attack the guilty plea. In view of the reliance placed by the Court of Appeals and the District

Court in their respective opinions in this case upon the statement of the concurring judge in the Tennessee Court of Criminal Appeals that "[n]o lawyer in this State would have ever thought of objecting to the fact that Negroes did not serve on the Grand Jury in Tennessee in 1948," the chances of respondent's being able to carry the necessary burden of proof in challenging the guilty plea would appear slim. Nonetheless, we prefer to have this issue, if it be open to respondent under federal habeas practice, first addressed by the District Court or by the Court of Appeals. Respondent was not at any rate entitled to release from custody solely by reason of the fact that the grand jury which indicted him was unconstitutionally selected, and the judgment of the Court of Appeals holding otherwise is reversed and remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

I would affirm the judgment of the Court of Appeals. I am convinced that Henderson amply demonstrated that he is entitled to relief on any acceptable theory of voluntariness, right to effective assistance of counsel, or waiver, and that no further proceedings are necessary. The Court adopts an inflexible rule in a case where, as the Court of Appeals noted, the facts establish a need for flexibility. 459 F. 2d 237, 242 n. 5 (CA6 1962). In doing so, it disregards this Court's previous counsel that whether a defendant is to be precluded from establishing a claim that his constitutional rights have been infringed "must depend, in each case, upon the particular facts and circumstances surrounding that case," *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938).

The Court relies on the "guilty plea" trilogy, *Brady* v. *United States,* 397 U. S. 742 (1970), *McMann* v.

*Richardson,* 397 U. S. 759 (1970), and *Parker* v. *North Carolina,* 397 U. S. 790 (1970). In each of those cases the Court held that a guilty plea, intelligently and voluntarily made, barred the assertion of later claims that at some point in the pretrial process, an admission of guilt had been unconstitutionally extracted, either through a coerced confession or through a plea of guilty induced by fear of enhanced punishment if such a plea were not made. In *McMann,* the Court summarized the view of the criminal process underlying those cases, stating, "In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession." 397 U. S., at 770.

The Court today extends that holding, so that, even where counsel does not consider and present to his client the possibility of a challenge to the composition of the grand jury, the client is nonetheless held to have made an "intelligent" guilty plea. I think that this extension of the "guilty plea" trilogy is misconceived. Those cases were concerned with the practical consequences of overturning negotiated pleas of guilty simply on the ground that the defense may have misjudged the possibility of successfully raising constitutional challenges to the pretrial proceedings. The Court recognized the importance of plea bargaining to the administration of criminal justice. See, *e. g., Brady* v. *United States, supra,* at 750–753. Promises of leniency, which the Court viewed as indistinguishable from the challenges in those cases, are used to induce defendants to forgo possibly meritorious challenges to the proceedings against them. This, the Court believed, permitted the imposition of punishment on offenders who deserved it, without significantly impairing the integrity of the criminal process by leaving unsanctioned all constitutional violations.

Whatever one may think of this analysis,[1] it is plainly premised on the notion of bargain and exchange: in return for relinquishing a constitutional challenge, the offender receives more lenient treatment. Clearly, that decision must be made by the defendant, for we would not let an attorney bargain away his client's rights.[2] It is the defendant who must, "with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty." *Id.*, at 750. Yet nothing like that happened in this case. Henderson's attorney never presented to him the possibility that, by insisting upon indictment by a properly composed grand jury, he might secure a more favorable bargain. See App. 83, 96.

The opinion of the Court devotes most of its attention to assertions and reassertions that in all cases a guilty plea "may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge." But the majority gives us almost no reason why those assertions should be accepted, and, with respect, I cannot accept them.

The Court invokes the specter of requiring counsel to present to his client "every conceivable constitutional

[1] MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and I dissented in *McMann* and *Parker*, believing that guilty pleas were so prevalent that it did impair constitutional protections to permit a plea to bar challenges to the prosecution.

[2] Some of this Court's decisions suggest that an attorney's decision, in which the defendant does not participate, not to raise a constitutional objection may sometimes preclude successful reliance on the constitutional claim. See *Henry* v. *Mississippi*, 379 U. S. 443, 451 (1965); *Brookhart* v. *Janis*, 384 U. S. 1, 7–8 (1966). If such a rule is to be squarely adopted by this Court, it should be limited narrowly to situations in which practical realities bar consultation, as often may happen during the course of trial. Cf. *Murch* v. *Mottram*, 409 U. S. 41 (1972).

plea in abatement," suggesting, I suppose, that there are such a huge number of conceivable constitutional objections to the prosecution as to make such a requirement utterly impractical. I doubt that this accurately reflects the true situation; in most cases only one or two possibly meritorious objections to the prosecution can be made before trial. And, after all, these are objections bottomed on constitutional guarantees. I would have thought that the fact that the Constitution placed limits on the prosecution would be very important in deciding whether a lawyer's professional responsibility required him to consult with his client before taking action that led to a relinquishment of the constitutional objection. Surely *Brady* implied as much in saying that guilty pleas, because they operate as a waiver of constitutional rights, "must be knowing, intelligent acts done with *sufficient awareness of the relevant circumstances* and likely consequences," 397 U. S., at 748 (emphasis added). The Court today extends the holdings of the "guilty plea" trilogy without reference to the rationale by which those cases were reconciled with the requirements of the Constitution that a plea is a waiver of constitutional rights only where the defendant has been informed of those rights and decides not to invoke them in order to gain some advantage.

In the end, the Court seems to adopt a concept of professional responsibility that I cannot accept. It would let an attorney "advance" the interests of his client without even informing himself about the facts underlying a constitutional challenge so that he might inform the client about the way in which, in the attorney's professional judgment, the course he is taking in fact advances those interests. "[F]aithful representation of the interest of his client," *ante,* at 268, means, I believe, that an attorney must consult with the client fully on matters of constitutional magnitude. Without

such consultation, the representation of criminal defend-ants becomes only another method of manipulating per-sons in situations where their control over their lives is precisely what is at stake.

If plea bargaining is to be constitutionally acceptable, it must rest upon personal choices made by defendants informed about possible alternatives; at least, they should know what options are open to them. In this case, Henderson might have secured a sentence shorter than 99 years by requiring the State to defend the con-stitutionality of its procedures for selecting grand juries. As is clear from this record, such a defense could not have succeeded, and the embarrassment of attempting a defense might well have led the prosecution to offer a more favorable bargain.[3]  I find nothing in the opinion of the Court that persuades me that Henderson's at-torney acted "within the range of competence demanded of attorneys in criminal cases," *McMann* v. *Richardson, supra,* at 771, because he did not consult with his client on a matter about which consultation is required.

Petitioner suggests, however, that Henderson's at-torney *may* have considered the possibility of challenging the indictment but rejected that course because he *be-lieved* that the grand jury was in fact selected by pro-cedures that conformed to constitutional requirements. There is only the barest support in the record for this contention,[4] and the District Judge explicitly found that

---

[3] Even if the State successfully defended its procedures in a preliminary attack, or if it decided to institute proceedings anew by convening a new grand jury, Henderson would have secured time in which to prepare a better defense and in which passions over his offense might subside, so that a plea of not guilty might have been more attractive to him.

[4] In a hearing held in state court on Henderson's application for collateral relief, an affidavit from the attorney who had represented him was introduced. It stated in part, "I have never been aware of any irregularity in the method of selection of grand or petit juries,

no objection was made by counsel "quite simply, because the possibility never occurred to him." 342 F. Supp. 113, 115. But even if petitioner's suggestion were correct, it would not advance his cause. For then, as Judge Celebrezze aptly put it, the attorney's decision would have been "grossly inadequate in light of the clearly established constitutional law of the period." 459 F. 2d, at 242 n. 5.[5]

Henderson was indicted in March 1948 by a grand jury in Davidson County, Tennessee.[6] Although Negroes constituted 25% of the population of the county in 1948, not a single Negro had served on the grand jury in the years before 1948.[7] In addition, whenever the name of a Negro appeared on the lists from which members of the grand jury were chosen, the letters "c" or "col" were marked next to the name. In the words of the Court of Appeals, "officials were thus provided with a simple means of determining which citizens might be appropriately 'excused' from grand jury duty. It is apparent from the absence of any Negroes on the grand jury panels that the means were used and the impermissible end of exclusion accomplished." 459 F. 2d, at 239 n. 2.

Two points about these facts must be emphasized. First, the law was clear in 1948 that it was extremely difficult for a State to establish that it did not unconstitutionally exclude Negroes from service on the grand jury if no Negroes in fact served and a method of selection was used

---

particularly in regard to systematic exclusion of members of any race . . . ." App. 96.

[5] In this regard the strictures in *McMann* v. *Richardson*, 397 U. S. 759, 772–773 (1970), against assessing decisions by counsel in the light of subsequent developments in the law have no force.

[6] Davidson County includes the city of Nashville.

[7] The first Negro to serve on the Davidson County grand jury was selected in 1953.

that brought to the attention of the persons selecting the grand jury the race of potential grand jurors. See, e. g., *Patton* v. *Mississippi,* 332 U. S. 463, 466 (1947); *Hill* v. *Texas,* 316 U. S. 400 (1942); *Smith* v. *Texas,* 311 U. S. 128 (1940). It was therefore relatively easy to assess whether, if an attorney could present that kind of evidence, a constitutional challenge to the indictment was likely to succeed. Thus, making the decision to challenge the grand jury is different from making the decision to challenge a confession as coerced or a search as unreasonable. The latter decision, as the Court emphasized in *McMann* v. *Richardson, supra,* at 769–770, often turns upon predictions about how certain facts will be viewed by a court attempting to apply largely unstructured tests of reasonableness or voluntariness under all the circumstances. I would therefore accord less weight to the fact that an attorney must make professional judgments in cases like this one than in cases like *McMann,* in line with the difference in the ease with which such judgments can confidently be made.

Second, it takes almost no inquiry at all to determine whether any Negroes had served on local grand juries and whether racial designations appeared on the lists from which grand jurors were chosen. In its quest to establish a general rule applicable to all cases of challenges to the composition of grand juries, the Court disregards this fact. Instead, it characterizes the problem as involving "amass[ing] a large quantum of factual data" and "elaborate consideration of whether pleas in abatement . . . might be factually supported." *Ante,* at 268. Whatever might be the situation in other cases, the facts in this case show that no large amounts of data or elaborate consideration is involved. That is enough to demonstrate the fallacy of the Court's attempt to define a broad general rule. I would adhere to tests

that turn on the facts of each case. Cf. *Johnson* v. *Zerbst,* 304 U. S. 458 (1938).

The Court suggests that the failure by Henderson's attorney to consider the possibility of a constitutional challenge may be excused because, in the words of a judge of the Tennessee Court of Criminal Appeals, 3 Tenn. Crim. App. 204, 211, 459 S. W. 2d 176, 179 (1970), "No lawyer in this State would have ever thought of objecting to the fact that Negroes did not serve on the Grand Jury in Tennessee in 1948." That statement is simply untrue. Even cursory research has disclosed several cases at the appellate level in which such challenges were raised by local attorneys. *Kennedy* v. *State,* 186 Tenn. 310, 210 S. W. 2d 132 (1947); *Williamson* v. *State,* 194 Tenn. 341, 250 S. W. 2d 556 (1952); [8] *Beckett* v. *United States,* 84 F. 2d 731 (CA6 1936). It may well be that Henderson "received the same advice on this point [that is, none at all] that he would have received from most other lawyers in Tennessee in 1948." 459 F. 2d, at 242 n. 6. That should not exonerate Henderson's attorney, though; it reflects, as Judge Celebrezze said, "a too-long tolerated gap between the requirements of the Constitution and realities of Tennessee Criminal practice." *Ibid.* Determination of whether counsel is competent should not turn on the fact that many attorneys in a particular place at a given time would not think of raising certain claims. The test must be whether the advice was competent in light of the law of the time,[9] and

---

[8] The offense in this case occurred in 1949; the report does not indicate when the trial commenced. In its opinion, the Tennessee Supreme Court noted that "some months ago this Court reversed a conviction . . . because *no* members of the colored race were summoned for jury service." 194 Tenn. 341, 346, 250 S. W. 2d 556, 558 (1952) (emphasis added).

[9] Including, of course, consideration of recent trends that might suggest fruitful attempts to raise claims rejected in decisions whose

without regard to local peculiarities. Cf. *United States ex rel. Goldsby* v. *Harpole,* 263 F. 2d 71, 82 (CA5 1959); *Windom* v. *Cook,* 423 F. 2d 721 (CA5 1970).

If Henderson's attorney had had even a passing acquaintance with the Tennessee Supreme Court's decision in *Kennedy* v. *State, supra,* a decision plainly relevant to Henderson's situation and recently decided, he would have immediately noticed that he had a very strong case. The Tennessee Supreme Court held that Kennedy had failed to prove his claim of unconstitutional discrimination in the selection of grand jurors. The court emphasized that the jury commissioners in Maury County selected names from tax books that "contained no identifying symbols whereby the race of any taxpayer might be known," and that 10 persons of 109 summoned for jury service were Negroes. 186 Tenn., at 316, 210 S. W. 2d, at 134. An attorney of minimal competence would have realized that, where no Negroes had been summoned for service over many years and where racial designations were used, the Tennessee Supreme Court would very probably have held the selection system unconstitutional, in line with the decisions of this Court.[10]

---

rationale has been undermined by later decisions. Cf. *Tehan* v. *Shott,* 382 U. S. 406 (1966); *Milton* v. *Wainwright,* 407 U. S. 371, 381–382 (STEWART, J., dissenting).

[10] Notwithstanding these differences between *Kennedy* and this case, petitioner suggests that it would have been "an exercise in futility" to have challenged the composition of the grand jury in this case. Brief for Petitioner 12. I would not lightly assume that a State's highest court would disregard clear holdings, consistently reiterated, of this Court. But even if petitioner's assessment is correct, it would further undercut extending the rationale of the "guilty plea" trilogy to this case. As I have said above, plea bargaining rests on an exchange. If the State refuses to acknowledge that it may have something to lose, by taking the position that state courts would fail to apply established constitutional standards to

I believe that the Court today adopts a rule that does not reflect the variety of circumstances in which claims like Henderson's arise. The Court's rule is particularly inappropriate in this very case. I therefore dissent.

---

undisputed facts, no bargain is possible. In such a case, even on the rationale of the "guilty plea" cases, the plea would be involuntary.

Petitioner's suggestion is of course premised on an estimate of how a competent attorney would have assessed the chances of prevailing on the constitutional challenge. Since Henderson's attorney made no such assessment anyway, the suggestion has no relevance to this case.