THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH GORGONE, Appellant.

First Department, April 17, 1975

*Jay Goldberg (Gretchen White Oberman* with him on the brief), attorney for appellant.

*Alan L. Kovacs (Peter L. Zimroth* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

NUNEZ, J. The defendant, Joseph Gorgone, was called as a witness before a New York County Grand Jury investigating the murder of Joseph Gallo. The indictment, charging defendant with criminal contempt in the first degree, recites that the Grand Jury sought to determine whether the defendant, together with Joseph Yacovelli, Joseph Luparelli and others, conspired to murder Gallo, and that the defendant contumaciously refused to say whether he knew Joseph Yacovelli or Joseph Luparelli. The defendant appeared before the Grand Jury on September 21, October 10 and October 17, 1972. During his first appearance, the District Attorney advised Gorgone that he had been granted immunity and attempted, judging from the record, unsuccessfully, to explain to him the

meaning thereof. Gorgone protested that he did not understand; that the questions tended to irritate and "incinerate" him; he pleaded to be permitted to come back the next day, that he was ill and dizzy and nervous and that if the District Attorney would write it down (the meaning of immunity) he would give him an answer the next day. This appearance ended with Gorgone's refusal to answer whether he knew Yacovelli and Luparelli.

At his second appearance, on October 10, Gorgone told the Assistant District Attorney that he was "very sick" and presented a letter from the medical director of St. Vincent's Hospital clinic stating that he had been a clinic patient there since 1964 following a construction accident which produced "considerable cerebral damage" and that

"Since [defendant's] initial appearance before the Grand Jury there has been a marked worsening and reappearance of florid symptoms. It is felt that continued appearances would result in total decompensation and are medically contraindicated. In view of this man's obvious disability, it is highly doubtful that he could contribute anything of import to the investigation.

"I hope you will consider this and excuse Mr. Gorgone from any further appearances."

The defendant was then taken before the court for a direction to answer the questions. The matter was adjourned until October 17, when the defendant appeared with court assigned counsel who informed the court that the defendant had been under psychiatric treatment for many years following a head injury, that his client did not understand what was going on, or why he was there, and did not understand the questions. Counsel then requested that Gorgone be sent to the court's psychiatric clinic to determine whether he was mentally competent to answer or understand any of the questions. (See CPL 190.30, subd 3.) This request was denied. The court did grant Gorgone's request to testify with his back to the Grand Jury on his claim that the "staring of the eyes of the Grand Jury" upset him.

At his October 17 appearance the defendant gave answers to the questions he had previously refused to answer, namely, whether he knew Yacovelli and Luparelli. The record shows that the defendant had great difficulty in answering the questions put to him. One cannot read the answers without concluding that the defendant is either a most skillful mental

malingerer or a mental incompetent. At the time he was indicted charged with criminal contempt, Gorgone was hospitalized in St. Vincent's, having developed signs of a seizure disorder evidenced by confusion and loss of balance.

Prior to trial, on defense counsel's motion, Gorgone was examined by two court appointed psychiatrists who found that the defendant was not mentally competent. One of the psychiatrists reported that Gorgone was unable to comprehend the nature of the grand jury proceeding and the function of a witness and both doctors noted that Gorgone's organic mental syndrome made it difficult for him to remember past events. Upon the filing of this report defendant moved for dismissal of the indictment. Following the denial of the motion to dismiss, the prosecutor moved for defendant's mandatory commitment to a State institution pursuant to CPL 730.50 based upon the findings by the psychiatrists. Following a hearing on the report, the court refused to order commitment without a more recent report on defendant's present condition and ordered another examination for such purpose. Later the same day the latter order was vacated upon the defendant's plea of guilty to one count of the five-count indictment. Thereafter a sentence of five years probation was imposed.

The defendant timely raised the question of his lack of mental capacity to understand the nature of the Grand Jury proceedings and to testify. CPL 190.30 clearly mandates that in such cases questions of competency are to be resolved by the District Attorney in the same manner as a court would resolve them. CPL 60.20 provides that a person is disqualified as a witness if the court finds that "by reason of * * * mental disease or defect, he does not possess sufficient intelligence or capacity to justify the reception of his evidence." His pleas of lack of understanding and mental illness were ignored by the District Attorney as well as by the court in violation of the mandate of CPL article 190 and of defendant's due process rights. *(Pate v Robinson,* 383 US 375; *United States v Silva,* 418 F2d 328.)* His plea should have been heard. He should have been psychiatrically examined before he was compelled to testify. A mentally incompetent person should not be indicted for his refusal to answer questions, since the essence of contempt is his willful intent to obstruct justice. *(People v Renaghan,* 40 AD2d 150, 152.)

The defendant's timely motion to dismiss the indictment pursuant to CPL 210.35 (subd. 5) was improperly denied. This

section permits a dismissal of the indictment if the grand jury proceeding is defective by failing "to conform to the requirements of article one hundred ninety to such degree that the integrity thereof is impaired and prejudice to the defendant may result."

We cannot agree with the People's contention that since by his voluntary plea Gorgone has admitted he was competent to understand and answer the questions before the Grand Jury, it is of no relevance whether he was given a psychiatric examination and competence hearing before he refused to answer, and that if such failures are defects at all, they are procedural defects which do not affect the jurisdiction of the court and which the defendant effectively waived by his guilty plea. In support of the waiver argument, the People cite, among others, the cases of *Tollett v Henderson* (411 US 258); *People v La Ruffa* (34 NY2d 242); and *McMann v Richardson* (397 US 759). However, the Supreme Court in *Blackledge v Perry* (417 US 21) modified its prior decision in *Tollett* and overturned *La Ruffa (supra)* reversed and remanded (419 US 959). The defendant in *Blackledge* pled guilty to a felony, after having been convicted of a misdemeanor resulting from the same criminal act in North Carolina. He thereafter attacked his felony conviction in Federal court on double jeopardy grounds. The Supreme Court stated that while the petitioner's [the Government's] reliance upon the *Tollett* opinion was understandable and that although the underlying claims presented in *Tollett* were of constitutional dimension, none went to the very power of the State to bring the defendant into court to answer the charge brought against him. In *Blackledge,* "by contrast, the nature of the underlying constitutional infirmity is markedly different. * * * Unlike the defendant in Tollett, Perry is not complaining of 'antecedent constitutional violations' or of a 'deprivation of constitutional rights that occurred prior to the entry of the guilty plea.' Rather, the right that he asserts and that we today accept is the right not to be hailed into court at all upon the felony charge. The very initiation of the proceedings against him in the Superior Court thus operated to deny him due process of law." *(Blackledge, supra,* at 30–31.)

Mr. Gorgone should not have been compelled to testify before the Grand Jury until the issue of his mental competence, timely raised, had been legally determined. His involuntary appearance and questioning before the Grand Jury and

the indictment against him which followed operated to deny him due process of law. When, after repeated requests, he was eventually psychiatrically examined, he was found mentally incompetent by both court appointed doctors. Under the circumstances we hold that the defendant's guilty plea did not foreclose him from attacking his conviction.

Judgment rendered in the Supreme Court, New York County (MURTAGH, J.) on May 31, 1974 convicting defendant upon his guilty plea of criminal contempt in the first degree and sentencing him to probation should be reversed on the law and the indictment dismissed.

KUPFERMAN, J. (concurring). As the Court of Appeals recently stated in *Matter of Brown v Ristich* (36 NY2d 183, 188, 189) "All adults are presumed competent to testify, and commitment to a mental institution does not automatically render a witness incompetent *(People v Rensing,* 14 NY2d 210, 213; *Barker v Washburn,* 200 NY 280; Richardson, Evidence [10th ed.], § 389). Certainly, an adverse party may put competency in issue and in such a case the matter is addressed solely to the discretion of the hearing officer who may examine the witness about to testify and any other person who can establish the mental capacity of the witness *(Aguilar v State of New York,* 279 App Div 103, 105; cf. *District of Columbia v Armes,* 107 US 519, 522)" and again: "A witness is said to be capable when he has the ability to observe, recall and narrate, i.e., events that he sees must be impressed in his mind; they must be retained in his memory; and he must be able to recount them with sufficient ability such that the presiding official is satisfied that the witness understands the nature of the questions put to him and can respond accordingly, and that he understands his moral responsibility to speak the truth (2 Wigmore, Evidence [3d ed.], § 492 et seq.)."

The defendant had been granted immunity.

One of the purposes of the interrogation of the defendant before the Grand Jury was to determine "whether the defendant was taking messages from Joseph Yacovelli both prior to and after the murder of Joseph Gallo to other Colombo crime faction members, namely Jerry Lancella." He could have been doing that even if mentally incompetent.

As the majority states, the essence of contempt is the "willful intent to obstruct justice."

The defendant was evidently disturbed by the questioning.

He was concerned about his own safety. When asked only if he knew one of the gentlemen under suspicion, in his own inimitable style he claimed the Fifth Amendment privilege, "I refuse to answer on the ground—incinerate me."

The importance of Grand Jury proceedings was stressed by the United States Supreme Court in *United States v Calandra* (414 US 338) where evidence was permitted despite otherwise exclusionary trial rules as to search and seizure in violation of the Fourth Amendment.

While I am bound by the determination as to competency, see *People v Reason* (44 AD2d 533), this is a vexatious case. Being incompetent to stand trial does not necessarily mean that you cannot answer questions. This defendant is not now committed to a mental institution as in *People v Jordan* (35 NY2d 577, 581).

MURPHY, TILZER and LANE, JJ., concur with NUNEZ, J.; KUPFERMAN, J., concurs in an opinion.

Judgment, Supreme Court, New York County, rendered on May 31, 1974, unanimously reversed, on the law, and the indictment dismissed.