UNITED STATES of America, Plaintiff,

v.

V.J. GEORGE, Defendant.

No. 83 CR 159.

United States District Court,
N.D. Illinois, E.D.

Jan. 8, 1988.

See also 679 F.Supp. 818.

Anton R. Valukas, U.S. Atty., Michael T. Mullen, Frank S. Cservenyak, Jr., Chicago, Ill., for plaintiff.

Walter Jones, Jr., Curiel & Jones, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

V.J. George ("George")[1] has filed a 28 U.S.C. § 2255 ("Section 2255") motion to vacate or set aside the probationary sentence imposed by this Court September 1, 1983. After its preliminary examination of the motion in accordance with Rule 4(b) of the Rules Governing Section 2255 Proceedings in the United States District Courts ("Section 2255 Rules"), this Court entered a June 24, 1987 memorandum order directing the United States to respond and, after full briefing, conducted an evidentiary hearing (see Section 2255 Rule 8).

*Facts*[2]

George was admitted to the United States as a lawful permanent resident Au-

---

1. This is the style under which George was indicted in this criminal case. As the later discussion will reflect, his civil challenge to a decision of the Board of Immigration Appeals ("Board") denying his motion to reopen deportation proceedings was brought under the name George Job Variamparambil (presumably his original name in his place of birth, and still his country of citizenship: India).

2. For the most part there is no dispute as to the relevant facts. In the one instance where this Court has had to resolve somewhat conflicting versions of the operative events, the text state-

gust 12, 1977 and has remained here since then. In April 1983 he was indicted for conspiring to distribute opium (21 U.S.C. § 846) and for actual distribution of that controlled substance (21 U.S.C. § 841(a)(1)). This Court appointed a Federal Defender Panel member, Charles Nixon ("Nixon"), to represent George under a proper Criminal Justice Act ("Act") showing of George's inability to retain private counsel.[3]

George and Nixon then proceeded to negotiate a plea agreement with the United States Attorney's office, and on June 21, 1983 this Court accepted George's guilty plea after the extended interrogation it always pursues in such situations. At that time George acknowledged that he:

1. made arrangements through codefendant M.E. Johnson (who pleaded guilty the same day) to have the third codefendant, Sam Joseph ("Joseph"), bring opium to Chicago for sale to people whom George did not know but who turned out to be undercover agents of the Chicago Police Department and the Federal Drug Enforcement Administration; and

2. sold 6,200 grams of opium to the undercover agents.

On September 1, 1983 this Court sentenced George and his two codefendants (Joseph had also pleaded guilty in the meantime). These currently significant developments are reflected in the sentencing proceeding:

ment will reflect that and identify this Court's findings.

**3.** Appointment of counsel was made in the regular fashion under this District Court's plan for appointment under the Act, 18 U.S.C. § 3006A. This Court's recollection is that Nixon happened to be the Federal Defender Panel duty attorney on the day George's previously-retained attorney had to withdraw on conflict-of-interest grounds (because he was also representing a codefendant). Whether or not that is so, once he was appointed Nixon of course owed George the same duties of competent representation as any retained lawyer is obligated to provide.

**4.** What Nixon said was this (Tr. 5–6):
Your Honor may recall some months ago I made an oral request to meet someone I termed a "confidential informant." The Government indicated there was no such per-

1. As part of his statement on George's behalf during the allocution hearing, Nixon adverted to an originally-perceived possible entrapment defense. Though Nixon then acknowledged no such legal defense existed,[4] he referred to the circumstances as a mitigating factor—urging this Court to consider the fact that George had gotten into the drug transaction with no background of that sort at all.

2. In outlining the grievous consequences of the offense to George (in an effort to persuade this Court to impose a sentence of probation alone), Nixon said (Tr. 10):
He's subject to deportation based upon the plea to these charges having to do with controlled substances. There is no defense to a deportation proceeding that would be taken against him. In other criminal matters we could ask the Court or we could ask the prosecutor to recommend not to deport. The statute is clear. If it involves even marijuana, deportation is mandatory.

3. When—immediately after Nixon had so concluded—George followed with his own brief statement in allocution (Tr. 11–12), he said nothing at all on the subject of deportation. Certainly he expressed no surprise at Nixon's statement on that score. In fact George's one sentence that bore any possible reading as referring to the subject said this (Tr. 11, emphasis added):

son. And I assume—or not assume—but the person mentioned in the Government's report is the guy, in their version, who is that person. The reason I wanted to talk to him was because of a possible entrapment defense. It would have been the only defense, as I viewed the evidence. Tape recordings of conversations, things of that nature, which were all lawfully made—by the way, there is no entrapment defense. I'm not trying to say that we have somehow been deprived of some sort of a right to proceed. That's not the tenor of my remarks at all. But the facts that surrounded that conceived-of defense, I think, explain to a certain extent, your Honor, what is maybe a mystery, how, that is, a man like Mr. V.J. George could get involved in such a terrible situation.

And I just ask you to give me a second chance to prove my worth to society, and I promise in my entire life, *no matter where it is,* I will always uphold the true virtues and perfections.

4. This Court in fact gave George the benefit of every doubt by giving him a straight probationary sentence,[5] and it said this on the deportation issue (Tr. 43): Unfortunately, Mr. Nixon has pointed out that I cannot make the same kind of recommendation in this case that is often made in cases of this kind. When I say "of this kind," that is, cases involving people who are in our country as guests, not yet citizens, as aliens. Ordinarily, if a Court feels as I do in your situation, I can make a recommendation that's not binding on the Immigration & Naturalization Service ["INS"], but that they tend to honor, in which I recommend against deportation. That's not possible. But, for whatever it's worth, I will only express my views that to the extent, if at all, the Immigration & Naturalization Service views itself as having any discretion in the case, I would hope that they would exercise that favorably toward you.

As Nixon's statement during the sentencing hearing had anticipated, INS did move to deport George. As the Court of Appeals later described what happened at the deportation hearing (831 F.2d at 1363):

[George] admitted the factual allegations in the order to show cause but denied deportability. He attempted to present evidence that he had been entrapped by the government and that his conviction was the result of the coerced guilty plea. The immigration judge refused to allow such evidence and on March 21, 1984 found [George] deportable as charged.

In addition (again consistently with Nixon's statement at the sentencing hearing), George was found "ineligible for any type of discretionary relief because of the convictions and because he had not accrued seven consecutive years of lawful, unrelinquished domicile in this country as required by § 212(c) of the INA, 8 U.S.C. § 1182(c), for waiver of exclusion or deportation" (*id.*).

George's entanglements with INS wound their way through the administrative process and to the Court of Appeals, which on October 15, 1987 (in *Variamparambil v. INS,* 831 F.2d 1362) rejected review of the decision in which Board had denied George's motion to reopen deportation proceedings. That leaves the current Section 2255 proceeding as George's last hope against deportation.

During the Section 2255 evidentiary hearing conducted by this Court, George and Nixon testified about their consultations both before and after George entered into the plea agreement pursuant to which he then pleaded guilty. George was positive that Nixon had never discussed George's immigration status or potential deportation *before* the plea agreement was entered into and this Court took his guilty plea. Nixon testified to having discussed deportation with George several times before the latter was sentenced—but Nixon was unsure whether the subject had been discussed before the date on which George pleaded guilty,[6] even though Nixon was actively engaged in the practice of immigration law and acknowledged that he was then aware George was a non-United States citizen. However, Nixon was certain he told George before the actual sentencing that George would face deportation. This Court credits (1) George's testimony as to the absence of any discussion of deportation before the guilty plea (as already indicated, Nixon did not testify to the contrary) and (2) Nixon's testimony as to the several discussions that took place after the guilty plea and before sentencing.

### Contentions of the Parties

George's current counsel complains on his behalf of Nixon's failure to have told George a probable consequence of his

---

**5.** This Court recalls no other instance during its time on the bench in which the seller in a major drug transaction was treated with anything approaching equal leniency.

**6.** That date, rather than the date of sentencing, was of course the critical one.

guilty plea would be deportation. According to the labels employed by counsel in George's initial memorandum to this Court, that failure violated George's right to due process as well as his right to effective assistance of counsel. In the argument portion of both the original and reply memorandum, though, the latter contention as to ineffective assistance is the only one made.

In response the government makes several arguments:

1. It characterizes George's potential deportation as a collateral rather than a direct consequence of his guilty plea, so Nixon had no duty (as this Court also did not under Fed.R.Crim.P. ("Criminal Rule") 11(c)) to advise George of that peril.

2. George cannot demonstrate harm from his guilty plea because:

(a) INS still had the right to deport him under INA § 212(a)(23) even in the absence of a conviction. Thus the potential for waiver of George's deportation under INA § 212(c), if he had satisfied the seven years'-lawful-domicile requirement, is irrelevant.[7]

(b) Nixon's representation not only did not fall below the objective standard of reasonableness (an issue related to the first argument described above) but also did not substantially prejudice George, inasmuch as the result of the criminal proceeding would not have been any different.

This opinion will treat with the contentions together, because they are so closely interwoven under the circumstances of this case.

### Effective Assistance of Counsel

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)

adopted a two-part standard for evaluating claims of ineffective assistance of counsel. First the Court said (*id.* at 687–88, 104 S.Ct. at 2064–65):

> When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

But taking a leaf from the *Wainwright v. Sykes* double-barreled approach requiring proof of both "cause" and "prejudice," the Court went on in *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

That second requirement of "prejudice" was predicated on this pragmatic view by the Court (*id.* at 691, 104 S.Ct. at 2066–67):

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.

Within two years after *Strickland* the Court was called on to determine the standard by which effective assistance of counsel should be judged in the context presented by this case—a guilty plea. *Hill v. Lockhart,* 474 U.S. 52, 58–59, 106 S.Ct. 366, 370–371, 88 L.Ed.2d 203 (1985) resolved that question this way:

> We hold, therefore, that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the *Strickland v. Washington* test is noth-

---

**7.** In literal terms, the Attorney General's statutory discretion to waive adverse action as to an alien domiciled in the United States for seven consecutive years applies only to excludable aliens seeking readmission (so that the waiver would apply to the *exclusion* of such aliens from the United States). But as *Variamparambil,* 831 F.2d at 1364 n. 1 noted, INS has (following a Second Circuit decision) acknowledged the identical waiver principles apply to resident aliens—such as George—who are ordered deported. One other explanatory note is in order. This opinion sometimes refers to INS as having the ability to waive George's deportation, even though the statute vests that power in the Attorney General. As *Patel v. INS,* 811 F.2d 377, 382 n. 10 (7th Cir.1987) has noted regarding another statutory waiver provision, "it is clear that the Attorney General may delegate his discretionary authority to make such decisions"—and he has done so as to the INA § 212(c) possible waiver of deportation as well.

ing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson* [411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) ], *supra,* and *McMann v. Richardson* [397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed. 2d 763 (1970) ], *supra.* The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill* went on to state the obvious—that depending on the nature of the underlying question, the habeas court might be required not only to determine whether defendant would have adhered to his or her plea or would instead have insisted on a trial, but also to pyramid the hypotheticals by predicting the outcome of such a trial. In that process (*id.* at 59–60, 106 S.Ct. at 370–371):

> As we explained in *Strickland v. Washington, supra,* these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." [466 U.S.], at 695 [104 S.Ct. at 2068–69].

In this instance the *Hill*-mandated inquiry is complicated. On the one hand, because George ended up only ten days short of the required seven years of lawful residence in this country, his counsel implicitly argues George had nothing to lose by going to trial: *Delay* would have been enough for him, irrespective of the trial's outcome. On the other hand, the government urges that the most George could call upon in any event is "the discretion of the Attorney General" (INA § 212(c)), and that George's deportation could be based not only on his conviction of a narcotics offense

but also on the fact that the "immigration officers know or have reason to believe [the alien] is or has been an illicit trafficker in any [such] drugs" (INA § 212(a)(23)). In short, the United States' end position is that the best George could hope for if he were to succeed would be to place himself in a situation where INS would have discretion to waive his deportation—but that George must fail because he cannot show such discretion would have been exercised in his favor.

That ultimate contention, however, impermissibly cuts across the separation of powers—it blurs the distinction between the executive branch and the judicial. This Court's role in this Section 2255 proceeding is to determine whether, when George's petition was filed, he was on probation in violation of his constitutional rights. Though an affirmative answer to that question still might not spare George from deportation (a matter for the Attorney General or INS as his designee to decide [8]), that does not automatically eliminate the need for a judicial determination of the question itself. Accordingly this opinion turns to what this Court ·can and must properly consider.

As one source of authority for its position that Nixon did not breach his effective-assistance responsibility, the United States points to a group of cases that have refused to hold Criminal Rule 11(c) violated when the *sentencing judge* has not advised a defendant of the possible deportation consequences of a guilty plea (see *United States v. Campbell*, 778 F.2d 764, 767 (11th Cir.1985); *Downs–Morgan v. United States*, 765 F.2d 1534, 1537–38 (11th Cir. 1985) and cases cited). But that is not at all the same as the question here. As is most frequently the case, this Court's first knowledge of George's alien status came *after* his guilty plea had been accepted—indeed, on the day of sentencing—and it came from the thorough presentence inves-

---

**8.** As the statement of facts has already pointed out, George was not permitted by Board to offer evidence of his alleged entrapment or coerced guilty plea at his deportation hearing. Additionally, discretionary relief was held unavailable because of George's conviction. Thus there is no way to tell how George would have been treated by INS had his situation in the criminal case been different.

tigation report (prepared of course after George had pleaded guilty). Absent authority imposing on the court a burden of inquiry as to a defendant's citizenship at the time the guilty plea is taken,[9] it would be anomalous to permit such a plea—valid when accepted—to be vacated at or after the sentencing date because such questions had not been asked and the related advice of potential deportation had not been given by the court. Hence the government can draw no comfort from the cases dealing with the lack of any *judicial* responsibility to inform the alien.

■ True enough, *Campbell*, 778 F.2d at 768–69 ("counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance") went on to extend the same principle to the defense lawyer's responsibility—or, more accurately, lack of responsibility. But the situation of the lawyer who *knows* of his or her client's alien status and fails to warn the client of the deportation effect of a guilty plea could well be viewed differently by the law.[10] *Downs–Morgan*, 765 F.2d at 1539 n. 12 (numerous citations omitted, emphasis in original) makes precisely that distinction:

A number of courts have held that the *trial judge's* failure to inform the defendant of the immigration consequences of his guilty plea does not render the plea constitutionally deficient.... This rule, however, does not necessarily dispose of the issue whether *counsel's* failure to apprise or misrepresentation to the defendant as to the possibility of deportation and exclusion can render the plea constitutionally inadequate because of counsel's ineffective assistance.

Most courts treat a lawyer's affirmative misrepresentation in response to a specific inquiry from an alien client as at least potentially qualifying for ineffective-assistance treatment, depending on all the other circumstances (*Downs–Morgan, id.* at 1540–41). But as to lawyer conduct that has been termed more "passive"—counsel's failure to advise about deportation consequences in the absence of such inquiry by the client—the courts are divided. In addition to the cases cited on both sides of that issue in *Downs–Morgan, id.* at 1539, see the later discussion in *People v. Padilla*, 151 Ill.App.3d 297, 302–03, 104 Ill.Dec. 522, 525–26, 502 N.E.2d 1182, 1185–86 (1st Dist. 1986) (rejecting the analysis and conclusion in *Campbell* and finding ineffective assistance in that situation).

This Court finds it difficult to justify any legal distinction between (1) active misrepresentations by counsel as to the alien's potential deportation consequences and (2) counsel's passive conduct in failing to raise such consequences in advising the alien client, at least where the lawyer knows enough immigration law to *know* that deportation will almost surely follow the guilty plea. In securities law, SEC Rule 10b–5 violations may comprise either material misrepresentations or the omission of material facts that cause the total disclosure to be misleading. Though this Court does not of course mean to elevate Rule 10b–5 to constitutional status, the notion that the lawyer who is aware of deportation as an almost inevitable consequence of a narcotics conviction may wait to see whether the lay client (an alien) who is ignorant of that consequence is nonetheless astute enough to ask about it—and the related notion that a constitutional obligation has been breached if the question is asked by the client, but not if the question is not asked—really has nothing to commend it in either logic or justice.

**9.** Criminal Rule 11(c) dictates a specific set of inquiries—and alienage and potential deportation are not among them. Similarly, nothing in the exhaustive line of questioning included in Chapter 1.06 of the Federal Judicial Center *Bench Book for United States District Court Judges* (the chapter setting out the recommended procedure for taking guilty pleas, implementing Criminal Rule 11(c)) even hints at asking any question bearing on those subjects.

**10.** For present purposes it need not be determined whether the lawyer's duty extends to inquiring of every client as to such status. Here Nixon admittedly knew the facts as to George's noncitizenship, and Nixon's conduct should be measured in that light.

But that question need not be resolved here, given the manner in which the *Strickland–Hill* standards bear on the unusual circumstances of George's case. Had Nixon told George the legal situation of which Nixon was well aware, it cannot be questioned that George would not have pleaded guilty. There was everything to gain and nothing to lose by his going to trial and forcing the government to prove its case against him. This Court never deals more severely at sentencing with a defendant who has done that—indeed, any such differential treatment would pose serious constitutional questions.[11] Hence the worst-case situation for George had he gone to trial would have been a guilty verdict and then a sentencing that—given the reasonable assumption of an equivalent delay between the sentencing and the final administrative order of deportation—would have allowed George to accumulate seven years of lawful domicile here [12] and therefore to be eligible for INA § 212(c) relief.

Thus the "prejudice" prong of the *Strickland–Hill* inquiry as to George is different from that in the ordinary case. Ordinarily the habeas court is called on to decide whether the result of the criminal case itself would likely have been different (in terms of conviction or acquittal) had counsel done his or her job competently. By contrast, even though there might not have been any difference in the end result (conviction) as to George,[13] as a properly-advised defendant George would still have opted for trial because of the important (indeed critical) consequences of the wholly legitimate delay that a trial would have generated in the timing of his conviction. In that way, even assuming George would still be convicted of the charged offense, he would be in a position to obtain an INS decision exercising or not exercising INA

§ 212(c) discretion *on the merits of George's total situation*—in place of the decision he actually received, under which Board held no such relief was available in any event because of George's failure to meet the seven-years'-lawful-domicile requirement.

### Potential Mootness

From the discussion to this point, it is clear that the ineffective representation by George's trial counsel impacts on George in procedural rather than substantive terms. That may readily be demonstrated by exploring the alternatives posed by George's present claim of entrapment:

1. It will be recalled that Nixon's statement at the September 1, 1983 sentencing hearing expressed the view that no valid entrapment argument could be advanced. Based on the version of events George provided to the probation officer for inclusion in the presentence report, together with the other facts furnished this Court in the sentencing process, Nixon's evaluation appears to this Court to reflect no lack of competence on his part in that respect, but rather a realistic characterization of George's legal position. If so, a trial would have produced a guilty verdict (and the same prospect of deportation as was created by George's guilty plea).

2. Suppose on the other hand that George's entrapment defense had been accepted by the trier of fact. In this Circuit no defendant can assert such a defense without *admitting* every element of the criminal offense, including the intention to commit the crime (see, e.g., *United States v. Gabriel*, 810 F.2d

11. That situation is to be distinguished, of course, from one in which a defendant not only elects to go to trial but also chooses to testify at trial—and does so falsely. False testimony at trial may properly be viewed by a sentencing judge as an aggravating factor.

12. It will be recalled George was just ten days short of the seven-year period when he pleaded guilty and was then caught up in the administrative proceedings. It is surely a reasonable as-

sumption that the inevitable delay of at least a few months that would have occurred had George gone to trial would have meant the administrative machinery would have begun to move that much later, producing the necessary end delay.

13. For the reason stated in the next section of this opinion, this Court need not resolve that question.

627, 637 (7th Cir.1987)).[14] And such an admission by George would have afforded INS ample fuel for his deportation under the alternate option provided by INA § 212(a)(23).[15]

Thus either assumption as to the possible effect of vacating George's guilty plea, allowing him to assert the only defense he now claims (entrapment), ends at the same destination: INS' right to deport him. And that issue comes down—in either event—to George's ability to have accumulated seven years' lawful United States residence, in turn permitting the possible exercise of executive discretion in his favor. That mandates this Court's further consideration of an issue not presented by the usual Section 2255 incompetence-of-counsel case involving a guilty plea, but clearly implicated here: mootness.

Because Nixon's ineffective assistance here lay in his failure to apprise George of facts that would have given rise to a *delay* in his conviction—not a change in result— and because the absence of that delay would cause ultimate prejudice to George only if INS would have exercised INA § 212(c) discretion in George's favor, the unusual circumstances of this case call for a stay in this Court's decision. That stay has as its purpose allowing INS an opportunity to decide whether such discretion should or should not be exercised favorably. If the answer is "yes," Section 2255 relief for George is appropriate; but if the answer is "no," the potential for prejudice to George would vanish and this case would be rendered moot.[16]

---

**14.** That issue is now pending before the Supreme Court in a case from our Circuit, *United States v. Mathews,* 803 F.2d 325 (7th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 1601, 94 L.Ed.2d 788 (1987). Even were the Supreme Court to reverse, and even were George to become entitled to an acquittal on entrapment grounds as a consequence, the facts he has admitted would still support the analysis in this paragraph of the text.

**15.** Because the sentence this Court imposed on George involved only a straight period of probation, which has now been fully served, George's liberty status in case of an assumed acquittal

*Conclusion*

This action is stayed to permit the Attorney General or his designee to determine whether a discretionary waiver of deportation under INA § 212(c) ought to be granted to George—treating him as a person with seven consecutive years of lawful, unrelinquished domicile in this country and hence eligible for such waiver of deportation. It is set for a further status report at 8:45 a.m. January 25, 1988, at which time the Assistant United States Attorney shall advise George's present counsel and this Court whether the Attorney General will proceed with such a determination.

would be no different from the situation in which he now finds himself.

**16.** This analysis is reinforced by the wide leeway given such discretionary decisions by the Attorney General. As *Patel,* 811 F.2d at 382 put it, quoting *Achacoso–Sanchez v. INS,* 779 F.2d 1260, 1265 (7th Cir.1985) (in turn quoting *Williams v. INS,* 773 F.2d 8, 9 (1st Cir.1985)):

Such a decision is to be upheld "unless it 'was made without rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group.'"