Richard Steven ZACEK, Appellant,

v.

Lou V. BREWER, Warden, Iowa State Penitentiary, State of Iowa, County of Linn, Appellees.

No. 58039.

Supreme Court of Iowa.

April 14, 1976.

Robert D. Bartels and Mark E. Schantz, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Earl W. Roberts, Asst. Atty. Gen., Eugene J. Kopecky, County Atty., for appellees.

Heard before MOORE, C. J., and MASON, RAWLINGS, UHLENHOPP and HARRIS, JJ.

MASON, Justice.

This is a postconviction proceeding instituted March 12, 1974, under chapter 663A, The Code, in which the appellant, Richard Steven Zacek, challenges his conviction of murder based on his tendered plea of guilty in the Linn district court April 24, 1970. The trial court at the plea stage in that proceeding personally interrogated defendant following the guideline standards set out in *State v. Sisco*, 169 N.W.2d 542, 547–548 (Iowa 1969), and, after determining defendant's plea was voluntarily and intelligently tendered and that a factual basis existed therefor, accepted the plea.

A hearing to determine the degree of guilt was held later and defendant was found guilty of second degree murder and sentenced to a term of 75 years May 29,

1970. Upon defendant's appeal from judgment following his conviction in that matter this court affirmed the conviction. 190 N.W.2d 415 (Iowa 1971).

A rather extensive factual recitation is necessary to achieve adequate discussion of the issues.

The events culminating in this appeal commenced October 20, 1969, with the discovery of the body of 17-year-old Jean Halverson in the Shaver-Mohawk Park area of Cedar Rapids. Miss Halverson had been shot to death the preceding day. An extensive homicide investigation, involving some 4300 man-hours, followed. Assistant Police Chief Kenneth L. Vanous and Captain of Detectives Wallace F. Johnson were in charge of the operation. Among others who worked in the investigation were Detectives Kenneth Millsap, C. R. Jelinek and James Steinbeck.

Police search of the scene of the crime, October 20 and 21, revealed, among other things, empty .22 caliber Federal brand shell casings, "nearby caches of obscene magazines," a set of car keys and a tab from a Polaroid camera. These materials as well as autopsy evidence were sent to the Federal Bureau of Investigation. An early lead in the case was occasioned by two telephone calls from the FBI on October 28 and 31, revealing that "the suspect in all probability was using a Browning .22-caliber semi-automatic rifle." There was also an "apparent flaw" in the weapon's firing pin leaving a distinctive mark on the shell casings.

It was then discovered from the records of Cedar Rapids gun dealers some 59 such rifles had been sold in the area since 1959. The test firing of these weapons with Federal brand ammunition indicated none of the shell casings matched those from the murder weapon. Another apparent investigatory dead-end was occasioned by the fruitless questioning of 15 "prime suspects," each of whom passed polygraph tests.

November 1 two duck hunters in the Swan Lake area near Coralville found part of a camera and turned it over to Cedar Rapids police. A subsequent police search of the scene yielded parts of a Caravel watch and two green "power pistons" from shotgun shells. The camera and watch, both of which had been shot apart, had belonged to the murder victim.

The discovery of the power pistons led the investigation somewhat in the direction of Zacek. November 4–8 saw the collection of a considerable amount of general evidence pointing to Zacek. The operator of Martin's Shooters Supply told an officer this type of green power piston was unusual in that it was designed for use in paper casings trap loads. At the time, most casings were made of plastic which utilized a specific power piston which was white. More significant, the officer was informed Zacek reloaded shotgun shells and that "he might be capable of a crime such as the Halverson murder."

A report was received from the Albuquerque, New Mexico, police department Zacek had been arrested for "disorderly conduct by prowling and vagrancy" back in 1963. The person complaining was an attractive young woman.

Further investigation entailed the interview of several gun dealers who had attended a gun show at Hawkeye Downs October 19, 1969 (the day of the murder). While none recalled seeing a Browning .22 caliber rifle that fit the description of the suspect's weapon, one dealer volunteered Zacek's name as a suspect. This man had seen Zacek at the gun show and characterized his behavior as "quite odd." He also stated Zacek "lived near the Mohawk Park area, had a great interest in girly magazines, * * * was a gun enthusiast and hunter and would have been familiar with the Coralville area." Members of the Otter Creek Gun Club, a club to which Zacek had been a member prior to his conviction for breaking and entering, corroborated the fact Zacek entertained these interests.

A member of the Peter Kohl family informed the police Zacek had, on October 19, returned to the Kohl residence "covered with mud and carrying an unidentified type of camera. Zacek and Peter Kohl reported-

ly left the Kohl residence and went to the Gun Show, where Zacek sold an unidentified type of .22 rifle."

The foregoing facts resulting from investigation were discovered, as stated, by November 8. And, until at least the following November 17, the investigation was apparently focused on another suspect.

November 19, 1969, saw the events leading to Zacek's arrest and eventual confession in the early morning hours of the next day. According to the "Agreed Statement of Facts," Detectives Millsap and Jelinek were, between 10:00 and 11:00 a. m., told to report to Assistant Chief Vanous, who ordered these two and Lieutenant William J. Byrne to enter the Zacek residence in search of helpful evidence in the Halverson case, even though Millsap and Jelinek protested that such an entry would be illegal. At approximately 1:00 p. m. Millsap and Jelinek entered the house while Byrne waited in the squad car. Millsap found and seized a plastic power piston. No one contends this entry into the Zacek home was legal.

At 8:55 p. m., police interviewed Peter A. Kohl, Zacek's brother-in-law. Kohl stated he saw Zacek the afternoon of October 19 "with the lower part of * * * [Zacek's] pantlegs soiled and carrying a camera." Zacek informed his wife he had been "over to the park" photographing friends riding motorcycles. Kohl also stated he and Zacek went to the Hawkeye Downs gun show, "where Zacek decided to sell a .22 Browning automatic."

Millsap and Jelinek interviewed Jon Phillip Kohl at 9:30 p. m., who stated Zacek and Peter Kohl had come to his gun booth at Hawkeye Downs October 19 and asked him to attempt selling a .22 Browning automatic rifle. Zacek left the gun at the booth but it was not sold. Two days later, Zacek picked up the rifle, claiming to have a buyer. Finally, several days after this, Zacek came to Kohl's house and sold the stock and forearm for $10.00. Zacek explained the purchaser had other wood he wished to install on the rifle.

At approximately 11:00 p. m. Detectives Millsap, Jelinek and James Steinbeck and Parole Officer Jack Harker went to the Zacek residence and asked Zacek to accompany them to the police station for questioning about a "violation of his parole and another incident that had happened." Zacek agreed, riding to the station house with Steinbeck and Jelinek. About this same time, Millsap informed Zacek's wife, Mary, the police had been to their residence earlier and had evidence leading them to "strongly suspect" her husband of murdering Jean Halverson. Upon asking her if she knew anything, Mrs. Zacek stated that several weeks earlier, she had pulled their Mustang from mud in the Coralville lake area.

Meanwhile, Zacek, Steinbeck and Jelinek arrived at the police station. Assistant Chief Vanous ordered Steinbeck to question Zacek. After signing of the "Waiver of Rights Form" and some discussion concerning the parole violation, inquiry commenced regarding Zacek's general activities the afternoon of the murder and his knowledge of the murder itself. After one hour, 20 minutes, Zacek said he would tell everything if he could see his wife. At 12:58 a. m., November 20, upon his wife's entry into the interrogation room, Zacek emotionally blurted out, "I don't know why I killed that girl." Following Mrs. Zacek's exit, Steinbeck reduced the confession to writing. It was signed by Zacek and by Steinbeck and Millsap as witnesses. Finally Zacek was booked for murder at 4:47 a. m., November 20.

It was between 11:30 p. m. and 12:00 midnight, November 19, that Vanous and Captain Johnson presented an application to Judge Harold Vietor for a search warrant to which they had sworn. It is not disputed this application contained false information to the effect police knowledge of the power pistons in Zacek's home came from a reliable informant. The information for the search warrant contains this statement:

"It is known also by information obtained from a confidential, reliable informant who is an upstanding, reputable, and creditable

citizen of Cedar Rapids, that Richard Zacek has at his residence green power pistons * * *. The confidential, reliable informant who gave the information of seeing the green power pistons at the Zacek residence is a reliable informant who in the past has given officers information at least ten times in the past and this information has led to the arrest and conviction in the past on these cases. The informant does not have any record as far as is known by us and he is an upstanding, reputable, creditable citizen of Cedar Rapids, Iowa, Linn County."

Clearly, either Millsap or Jelinek was the "confidential informant." Assistant Chief Vanous admitted this at the hearing July 29, 1974.

In any event, based upon this and other information, Judge Vietor issued the search warrant at 1:08 a. m. November 20, 1969. The inventory list of items seized included pornographic magazines, a Polaroid "camera kit" and negative, various .22 caliber shells, and reloaded shotgun shells, green power pistons and several guns. In the agreed statement of facts, it is stated the empty .22 caliber shell casings had "the same distinctive firing pin mark" mentioned earlier.

Attorneys R. Fred Dumbaugh and Robert Matias, ignorant of the illegal search, advised Zacek to plead guilty. After hesitation Zacek agreed. As pointed out, the plea was entered in the Linn district court April 24, 1970, and the degree of guilt hearing was held May 20.

November 21, 1973, the Linn county attorney informed Mr. Dumbaugh of the illegal entry into the Zacek home. At the subsequent postconviction hearing July 29, 1974, Dumbaugh testified as to his and Mr. Matias' scrutinization of the search warrant and evidence. After an unsuccessful attempt to have the confession declared involuntary, the attorneys "reevaluated the case" and arrived by "mutual consensus" at a decision they had a very poor case and that there would probably "be a first degree murder verdict" if they went to trial. Zacek finally agreed.

Dumbaugh further stated he knew nothing definite as to the illegal search until the day county attorney Faches subpoenaed him into his office. He had heard rumors but these were after the county attorney investigation had commenced.

In answer to a question whether Zacek would have been represented differently had this information been known, Dumbaugh stated:

"Yes, it certainly would have been. Had I known of a breakin or entry into Mr. Zacek's home that had taken place without the benefit of search warrant and, so to speak, without authorization of the Court, we certainly would have approached the matter differently. I have given a great deal of thought since I became aware of it, and had that happened, I am sure, number one, we would have filed a Motion to Suppress any evidence gathered during that search and also any subsequent search based upon the fruits of the poisonous tree doctrine. I think that's a strong enough case that, should we have lost that motion let's say at the trial court level, I certainly would have never recommended to the defendant that he plead guilty.

"I would have been inclined to say let's go ahead, try the case, and if we lose the case, we will take it up because I think it's a very serious constitutional question and I think the evidence that would have been gathered in that regard would have obviously been tainted. * * * I think this would have been additional grounds to throw into a Motion to Suppress Confession also. So had we known of that at that time, Mr. Zacek would have not have entered a guilty plea to this charge with me as his attorney because, had he wanted to enter a plea of guilty and insisted on it, being his attorney, I would have withdrawn."

Dumbaugh stated his feelings on attacking the search warrant "very definitely" changed on discovery of the illegal entry. Furthermore, he contended at the hearing the confession would come under the fruits of the poisonous tree doctrine.

Finally, to clear up any confusion caused by the trial court's finding of fact 28, Dumbaugh deposed and stated before a notary public he intended to testify as set forth in paragraph 2 in the "Application for Amendment of Finding of Fact; Motion for New Trial." In short, Dumbaugh thought the physical evidence alone was probably sufficient to attain a conviction. Yet, upon gaining knowledge of the illegal search, Dumbaugh "would not have participated in a plea of guilty; rather, he would have pursued motions to suppress both the physical evidence and the confession, and even if those had been denied, he would have gone to trial in order to preserve those issues on appeal, and further would have pursued all available appellate review."

The trial court denied Zacek's application for postconviction relief; it concluded as a matter of law " * * * when a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. Under such circumstances, the defendant may only attack the voluntary and intelligent character of the plea by showing that the advice he received from counsel was not within the standards set forth in *Tollett v. Henderson*, 411 U.S. 258 [93 S.Ct. 1602, 36 L.Ed.2d 235] (1973)."

Also included in the trial court's conclusions of law is the statement entry of a plea of guilty waives the right to attack a false and misleading affidavit for search warrant.

Upon Zacek's application for amendment of findings of fact; motion for new trial, the trial court reaffirmed its earlier findings of fact: (1) the plea was knowingly, intelligently, and voluntarily made and that there did not exist a significant nexus between the plea and the illegal search; (2) Zacek received effective assistance of counsel; (3) Zacek was not deprived of due process of law by virtue of purposeful concealment by police as opposed to the county attorney; and (4) there was no sig-

nificant nexus between alleged deprivations of constitutional rights and Zacek's conviction. The trial court also again noted Zacek waived error by entry of the plea.

Fairly summarized in somewhat different language from that employed by the parties, the following issues are presented for review by Zacek's appeal from the trial court's ruling denying postconviction relief: (1) whether petitioner is precluded, due to his prior appeal, from raising the issues; (2) whether the court erred in holding the plea of guilty was voluntarily, knowingly and intelligently tendered when it was entered in ignorance of facts materially favorable to the defense which were suppressed by agents of the State; (3) whether police concealment of facts which would have led a reasonably competent attorney to suppress significant portions of the State's evidence deprives Zacek of the effective assistance of counsel; and (4) whether concealment by police of exculpatory evidence constitutes a denial of due process of law.

I. The State at the outset declares the issue of the knowing, intelligent and voluntary character of Zacek's plea of guilty has "already been adjudicated" in *State v. Zacek*, 190 N.W.2d 415 (Iowa). In reply, petitioner sets forth the argument he is here raising a different issue from that asserted in the previous appeal. And in that regard, it is clear the question as to the State's deliberate suppression of material evidence rendering the plea involuntary was not raised in the initial appeal for the simple reason it was unknown to apparently everyone except the offending Cedar Rapids police officers.

Just as in *Rinehart v. State*, 234 N.W.2d 649, 655 (Iowa 1975), " * * * we resolve any doubt in favor of the applicant and treat the allegation as one asserting a new legal basis for granting relief, * * * [citing *Sanders v. United States*, 373 U.S. 1, 16, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148]." It should furthermore be noted under section 663A.8, The Code; petitioner has shown " * * * 'sufficient reason' why the ground now relied on was not previously asserted." *Rinehart v. State*, 234 N.W.2d

at 657. Section 663A.8, The Code, does not preclude Richard Zacek from raising the issues on this appeal.

II. The second and third issues presented for review, namely the suppression of evidence rendering Zacek's plea involuntary, and suppression of evidence constituting denial of effective assistance of counsel, are rather interrelated.

Petitioner argues his plea of guilty was not knowingly, voluntarily and intelligently entered because the State deprived him of the opportunity to make an intelligent choice among alternative courses of action open to him. These alternatives—plead guilty or go to trial where the State could introduce the illegal evidence with the strong possibility of a verdict of first degree murder—were "artificially restricted by reason of the intentional suppression [of the fact the search was illegal] by the police." The plea was thus rendered unintelligent.

It is also argued since the illegal break in could well taint the admissibility of the confession as well as the fruits of the later search under warrant, counsels' legal strategy was affected. Expressed differently, the attorneys' advice to plead guilty was based on their belief this evidence was admissible. But for the State's deliberate concealment, then, of the real strength of its case, Zacek would never have pleaded guilty.

Furthermore, due to the foregoing, Zacek urges the incorrectness of the trial court's finding there was no significant nexus between the police burglary and the confession, or between the burglary and decision to plead guilty. Even if the "nexus" findings were valid, petitioner states this is not the issue. "In order to establish grounds for sustaining his application, it merely had to be shown that the plea was not voluntary, knowing, or intelligent. These grounds can be established, and were established, without conclusively demonstrating the inadmissibility of Applicant's confession."

Petitioner's contentions in this assignment may be boiled down, in reality, to the following: Deliberate suppression of police infringement of Zacek's *constitutional rights* rendered his subsequent plea of guilty involuntary, unknowing and unintelligent.

And in connection with this the United States Supreme Court in *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–1469, 25 L.Ed.2d 747 (1970), stated:

"That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so—hence the minimum requirement that his plea be the voluntary expression of his own choice. But the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."

Further support for petitioner's position is found later in the *Brady* opinion, when the Court noted:

" ' "[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes)." * * * [quoting from *Shelton v. United States*, 242 F.2d 101, 115 (5 Cir. 1957), hearing en banc 246 F.2d 571, 572, n. 2, rev'd on confession of error on other grounds, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d

579 (1958)].'" 397 U.S. at 755, 90 S.Ct. at 1472, 25 L.Ed.2d at 760.

Thus, deliberate concealment (a form of misrepresentation) by the police may well have rendered Zacek's plea involuntary, unknowing and unintelligent, causing it to be entered without sufficient awareness of the relevant circumstances. Yet, petitioner may have "assumed the risk," so to speak, by his uncompelled decision to so plead.

In *McMann v. Richardson*, 397 U.S. 759, 769–770, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970), the Court noted:

"As we said in *Brady v. United States*, 397 U.S., at 756–757, 90 S.Ct., at 1473–1474, 25 L.Ed.2d 747, the decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. * * * [A] decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts."

Perhaps more significant, the *McMann* Court hewed the rule more specifically articulated in a later opinion, namely, that a habeas corpus petitioner must show more than merely the denial of constitutional rights preceding a plea of guilty. Justice White spoke for the Court:

"In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be

right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases. On the one hand, uncertainty is inherent in predicting court decisions; but on the other hand defendants facing felony charges are entitled to the effective assistance of competent counsel. Beyond this we think the matter, for the most part, should be left to the good sense and discretion of the trial courts with the admonition that if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts.

"We hold, therefore, that a defendant who alleges that he pleaded guilty because of a prior coerced confession is not, without more, entitled to a hearing on his petition for habeas corpus." *McMann*, 397 U.S. at 770–771, 90 S.Ct. at 1448–1449, 25 L.Ed.2d at 773.

The Supreme Court made itself abundantly clear in *Tollett v. Henderson*, 411 U.S. 258, 265–267, 93 S.Ct. 1602, 1607–1608, 36 L.Ed.2d 235 (1973). Justice Rehnquist stated:

" * * * But the Court in *Brady [v. United States]* and *Parker [v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970)]*, as well as in *McMann*, refused to address the merits of the claimed constitutional deprivations that occurred prior to the guilty plea. Instead, it concluded in each case that the issue was not the merits of these constitutional claims as such, but rather whether the guilty plea had been made intelligently and voluntarily with the advice of competent counsel.

" * * * In the latter cases, the facts giving rise to the constitutional claims were generally known to the defendants and their attorneys prior to the entry of the guilty pleas, and the issue in this Court turned on the adequacy of the attorneys' advice in evaluating those facts as a part of the recommendation to plead guilty. In the

instant case, the facts relating to the selection of the Davidson County grand jury in 1948 were found by the District Court and the Court of Appeals to have been unknown to both respondent and his attorney. If the issue were to be cast solely in terms of 'waiver,' the Court of Appeals was undoubtedly correct in concluding that there had been no such waiver here. But just as the guilty pleas in the *Brady* trilogy were found to foreclose direct inquiry into the merits of claimed antecedent constitutional violations there, we conclude that respondent's guilty plea here alike forecloses independent inquiry into the claim of discrimination in the selection of the grand jury.

"We hold that after a criminal defendant pleads guilty, on the advice of counsel, he is not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected. The focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional · infirmity. A state prisoner must, of course, prove that some constitutional infirmity occurred in the proceedings. But the inquiry does not end at that point, as the Court of Appeals apparently thought. If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases,' * * * [citing *McMann*]. Counsel's failure to evaluate properly facts giving rise to a constitutional claim, or his failure properly to inform himself of facts that would have shown the existence of a constitutional claim, might in particular fact situations meet this standard of proof. Thus, while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief.

"We thus reaffirm the principle recognized in the *Brady* trilogy: a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*." See also *Blackledge v. Perry*, 417 U.S. 21, 29, 94 S.Ct. 2098, 2103, 40 L.Ed.2d 628 (1974).

Expressed in different terms, "in most States a defendant must plead not guilty and go to trial to preserve the opportunity for state appellate review of his constitutional challenges to arrest, admissibility of various pieces of evidence, or the voluntariness of a confession. A defendant who chooses to plead guilty rather than go to trial in effect deliberately refuses to present his federal claims to the state court in the first instance. * * * [citing *McMann*]. Once the defendant chooses to bypass the orderly procedure for litigating his constitutional claims in order to take the benefits, if any, of a plea of guilty, the State acquires a legitimate expectation of finality· in the conviction thereby obtained. * * * [citing authority]." *Lefkowitz v. Newsome*, 420 U.S. 283, 95 S.Ct. 886, 889, 43 L.Ed.2d 196 (1975).

"The [Supreme] Court has placed a very heavy burden on one alleging incompetent advice, declining to find it even where both the defendant and his counsel were unaware at the time the plea was entered of substantial material facts or defenses. * * While it is sometimes said that a waiver is a voluntary surrender of known rights, it may also be intended as a voluntary surrender of all rights, known and unknown. * * * [citing authorities]. A guilty plea is normally understood as a lid on the box, whatever is in it, not a platform from which to explore further possibilities." *United States v. Bluso*, 519 F.2d 473, 474 (4 Cir. 1975).

This court has said: " * * * defendant pleaded guilty in open court, with assistance of counsel, knowingly and under-

standingly. By reason thereof he waived all constitutional guaranties with respect to conduct of criminal prosecution and any objection to prior proceedings which may include a violation of his rights. * * * [citing authorities]." *State v. Delano*, 161 N.W.2d 66, 73 (Iowa 1968).

In support of the proposition a voluntary and intelligent plea of guilty eliminates all questions concerning admissibility of evidence or the constitutionality of a confession are the following cases: *State v. Nicholson*, 109 Ariz. 6, 503 P.2d 954, 956; *People v. McKirdie*, 45 Ill.2d 300, 259 N.E.2d 16, 18, cert. den., 400 U.S. 1010, 91 S.Ct. 571, 27 L.Ed.2d 624; *State v. Kobrock*, 213 N.W.2d 481, 483 (Iowa 1973); *Collins v. State*, 210 Kan. 577, 502 P.2d 851, 852; *State v. Turcotte*, 164 Mont. 426, 524 P.2d 787, 788–789 (1974); *Stevenson v. State of Wisconsin*, 392 F.Supp. 35, 37 (E.D.Wis.1975); *Krider v. Wolff*, 396 F.Supp. 741, 742 (D.Neb.1974); and *Huffman v. State of Missouri*, 399 F.Supp. 1196, 1201–1202 (W.D.Mo., W.D. 1975).

In *State v. Burtlow*, 210 N.W.2d 438, 439 (Iowa 1973), this court declared that "a guilty plea voluntarily and intelligently made by a defendant constitutes an admission of guilt and when accepted by the court constitutes a conviction of the highest order. Such a plea waives all defenses and irregularities except that the information or indictment charges no offense and the right to challenge the plea itself. * * * [citing authorities]."

■ The fact that prior to the entry of his guilty plea on the advice of counsel petitioner was deprived of constitutional rights cannot afford him the relief sought under the principles announced in the foregoing authorities unless, as stated in *Tollett*, he attacks "the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*."

III. Petitioner pursues this line of attack in seeking reversal. It is argued the guilty plea was entered without knowledge of (1) the illegal search of the Zacek residence, (2) the fact the illegal search rendered most of the physical evidence seized inadmissible, and (3) additional grounds to challenge the confession, due to the illegal search. He insists "this lack of knowledge was the result of deliberate non-disclosure by the police rather than by any lack of diligence on the part of Appellant or his counsel." Thus, counsels' assistance was "ineffective by reason of their *inability* to consider facts material to an intelligent decision on whether or not to plead guilty." Police concealment, then, caused counsel to render ineffective assistance.

The State counters counsel were effective or competent *at the time* their advice was given (as petitioner concedes) and that "the focus of *Tollett v. Henderson*, supra, is primarily upon the competence of a defendant's attorney under the circumstances that existed at the time counsel's advice was given to the defendant."

The State also distinguishes the cases petitioner contends support his position counsels' advice was ineffective. Specifically, it is argued these cases deal with situations where counsel was "*prevented* from making meaningful preparation" in that sufficient time was denied or where effective assistance was "fettered by government harassment." In addition, the State notes the other cases deal with situations where counsel was in some manner negligent.

The *Tollett* Court held a petitioner, in addition to showing some constitutional infirmity occurred in the proceedings, must also demonstrate his attorney's " * * * advice was not 'within the range of competence demanded of attorneys in criminal cases,' * * *." The determination whether counsels' advice was effective necessarily rests upon both federal *and state* law, as "the right to counsel is the right to the effective assistance of counsel, * * * [citing *McMann*], and an accused is assured under the provisions of section I, Amendment 14 of the federal constitution and sections IX and X of Article I of the Iowa Constitution of this right and the right to receive a fair trial. * * * [citing au-

thority]." *State v. Williams*, 207 N.W.2d 98, 104 (Iowa 1973).

Thus, in *Ogden v. State*, 215 N.W.2d 335, 337–338 (Iowa 1974), this court stated:

"Admittedly the right to counsel means effective assistance of an attorney. See *McMann v. Richardson*, 397 U.S. 759, 771, n.14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); *State v. Williams*, 207 N.W.2d 98, 104 (Iowa 1973).

"And in *State v. Massey*, 207 N.W.2d 777, 780 (Iowa 1973), this court aptly stated:

" 'The test is whether in all the circumstances counsel's performance was within the range of normal competency. *Moore v. United States*, 432 F.2d 730, 737 (3 Cir. 1970). To warrant finding a deprivation of due process, such circumstances must include "an affirmative factual basis demonstrating counsel's inadequacy of representation." *In re Parker*, 423 F.2d 1021, 1025 (8 Cir. 1970).' * * * [citing authorities]."

And, " ' "Effective" * * * means conscientious, meaningful representation wherein the accused is advised of his rights and honest, learned and able counsel is given a *reasonable opportunity* to perform the task assigned to him.' " *Orcutt v. State*, 173 N.W.2d 66, 69 (Iowa 1969). (Emphasis in *Orcutt*). See also *Kime v. Brewer*, 182 N.W.2d 154, 156 (Iowa 1970) and *State v. Williams*, 207 N.W.2d 98, 104 (Iowa 1973).

Stated somewhat differently, this court has also held effective assistance " * * * means not only providing defendant with a lawyer; it also means providing that lawyer with the opportunity—in both time and tools—to perform his often onerous task competently and conscientiously. * * * [citing authorities]." *State v. Campbell*, 215 N.W.2d 227, 229 (Iowa 1974).

Thus, in *Orcutt v. State,* supra, counsel's being denied sufficient time to prepare the case, even though there was no allegation counsel was generally incompetent, deprived meaningful assistance of counsel. And in *State v. Williams*, 207 N.W.2d at 104, this court, quoting from *United States v. Germany*, 32 F.R.D. 421, 423 (D.C.1963), stated:

" ' * * * An essential ingredient to an attorney effectively representing a defendant in a criminal case, when it comes to determining whether that attorney has had an "opportunity" to investigate and prepare the case, is funds to pay the necessary and essential expenses of interviewing the material witnesses and in viewing the scene of the alleged crime.' "

█ It becomes apparent, then, an attorney may render ineffective assistance through no fault of his own. Actions by the state may deprive an attorney of the opportunity to effectively assist an accused.

The foregoing cases, concerning time and money, are obviously distinguishable from the instant case in a factual sense. Yet the statements of law are, logically, applicable to this case. The State, through its police, deprived counsel of the opportunity to present a plainly substantial defense. It is difficult to accept the State's argument simply because the counsels' advice was competent "when given," petitioner was not denied the right to effective assistance. It would seem appointment of counsel here, in the words of *Orcutt v. State*, 173 N.W.2d at 69–70, turned out to be " ' " * * * the granting of a barren right." * * *.' "

Petitioner refers the court to a case research reveals is as relevant factually as any in *Wounded Knee Legal Defense/Offense Com. v. F.B.I.*, 507 F.2d 1281 (8 Cir. 1974), members of a committee formed to provide free legal aid to defendants involved in the Wounded Knee incident claimed the F.B.I. was harassing their efforts. The committee sought injunctive relief and the F.B.I. asserted the federal court was without jurisdiction. The Eighth Circuit Court of Appeals, per Webster, J., disagreed, declaring:

" * * * With even stronger force it may be said that a lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel. It requires no citation of authorities to reaffirm our historic commitment to effective

assistance of counsel in criminal cases. That right may not be fettered by harassment of government officials, and any claim which factually asserts such harassment presents a federal question for our determination." 507 F.2d at 1284.

Bearing in mind the principles recognized in the *Brady* trilogy and in *Tollett* the question is whether petitioner has demonstrated that the advice rendered by his attorneys at the plea and sentencing stage was not within the range of competence demanded of attorneys in criminal cases by his showing of the deliberate concealment by the Cedar Rapids police of their illegal search and seizure which had occurred before tender of petitioner's guilty plea.

This portion of the statement quoted in division II of this opinion from *Tollett* is appropriate to a determination of this question:

" * * * Counsel's failure to evaluate properly facts giving rise to a constitutional claim, or his failure to properly inform himself of facts that would have shown the existence of a constitutional claim, might in particular fact situations, meet this standard of proof."

In this connection it is beyond dispute defense counsel failed to inform themselves of the facts surrounding the illegal search of Zacek's home which would have disclosed existence of a constitutional claim. This was not a factual situation involving counsels' misjudgment as to the admissibility of a confession. Rather, it presents one where counsels' assistance was rendered ineffective by reason of police concealment which, in our opinion, involves the concept of fundamental fairness.

As pointed out, the offensive nature of the break in was compounded when police officers, by lies and half truths, concealed the illegal acts from petitioner, his attorney, the county attorney, and a district court judge.

In *Dukes v. Warden, Connecticut State Prison*, 161 Conn. 337, 288 A.2d 58, 61–62 (1971), aff'd, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972), rehearing den., 407 U.S. 934, 92 S.Ct. 2464, 32 L.Ed.2d 817 (1972), the Connecticut court had this to say:

" * * * Where, as here, however, a guilty plea in entered on the advice of counsel, the plea constitutes an admission of guilt and a waiver of nonjurisdictional defects and claims, including federal constitutional claims, which might otherwise be raised by way of defense, appeal or collateral attack. * * * [citing authorities]. * * * Of course, a guilty plea does not constitute a waiver of a claim that the plea itself was rendered involuntary and unintelligent as a result of a violation of an accused's *fundamental constitutional rights.* * * * [citing authorities]." (Emphasis supplied).

The Pennsylvania Court has noted: "*Absent unusual circumstances,* a guilty plea constitutes a waiver of any non-jurisdictional defects or defenses. * * * [citing authorities]." (Emphasis supplied). *Commonwealth v. Pyle*, 342 A.2d 101, 103, n.4 (Pa.1975).

In *People v. Twomey*, 16 Ill.App.3d 568, 306 N.E.2d 708 (1973), a case where the "abstract" (headnotes) only was published, the headnote provides: "Waiver doctrine, that is, that plea of guilty waives nonjurisdictional defects must yield *where considerations of fundamental fairness so require.*" (Emphasis supplied).

Mr. Justice Brandeis, dissenting in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944, 959–960 (1928), said:

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end

justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

Mr. Justice Frankfurter, in *Rochin v. People of California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952), wrote:

" * * * Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' *Malinski v. People of State of New York,* supra, 324 U.S. [401] at pages 416–417, 65 S.Ct. [781] at page 789 [89 L.Ed. 1029]. These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', *Snyder v. Commonwealth of Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, or are 'implicit in the concept of ordered liberty'. *Palko v. State of Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288."

" * * * [W]e are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience." 342 U.S. at 172, 72 S.Ct. at 209, 96 L.Ed. at 190.

■ In our opinion the police activity in concealing the circumstances relating to the illegal search as well as the entry itself as shown by the present record violated the concept of fundamental fairness inherent in the due process clause. But this is not a complete answer to the question stated earlier.

The State's response to petitioner's contention he was denied due process made at another point in argument is pertinent to a determination of the present problem. In that connection the State insists petitioner is not entitled to the relief sought since the suppressed evidence is not material when judged in relationship to the rest of the evidence in the case. The basis of this argument rests on the theory there is substantial physical evidence as well as a voluntary confession "independent" of the evidence seized in the warrantless search; that the evidence uncovered by the illegal search and seizure was not material to petitioner's guilt.

■ Ordinarily, materiality relates to the pertinency of offered evidence to an issue in dispute or to the issue of credibility. *State v. Clay,* 213 N.W.2d 473, 477 (Iowa 1973). At issue here was the admissibility of petitioner's confession and of other evidence offered by the State, both certainly material to petitioner's guilt. Evidence bearing on the legality of the search of Zacek's home and the seizure of evidence as a result thereof would be material on the question of admissibility of the confession, the physical evidence and the validity of the search warrant.

The deliberate concealment by the police from petitioner and his attorney of the facts relating to the fundamentally unfair search and seizure prevented counsel from informing themselves of the facts surrounding the illegal seizure and the possible existence of a constitutional claim. Knowledge of the existence of this evidence on the part of defense counsel was vital to their decision whether to advise petitioner to tender a guilty plea or to stand trial. See *United States v. Agurs,* 167 U.S.App.D.C. 28, 510 F.2d 1249 (1975), appeal pending.

In answer to the question presented it is our opinion petitioner has sufficiently demonstrated that the nature and extent of the fundamentally unfair police activity deprived his counsel of the opportunity to effectively assist petitioner to the extent

their advice, through no fault of their own, was not "within the range of competence demanded of attorneys in criminal cases." This rendered his subsequent plea of guilty involuntary and unintelligent.

Our decision renders unnecessary any further consideration of the issue presented by petitioner's remaining assignment dealing with due process which is closely related to the foregoing discussion on fundamental fairness.

The case is remanded for an order of the trial court setting aside petitioner's plea of guilty and the judgment and sentence imposed on his conviction by such plea and permitting him to plead anew.

We wish to make clear the Linn county attorney in office at the time of petitioner's conviction in 1970 first learned of the illegal concealment as a result of an investigation commenced in the latter part of August 1973 into alleged illegal activities of various officers in Cedar Rapids and that he informed the attorneys who acted as petitioner's counsel at the plea and sentencing stage of his findings concerning the entry of the Zacek residence.

We wish to commend his conduct.

The case is

Reversed and remanded.