Merlin C. LONG, Appellant,

v.

Lou V. BREWER, Warden of the Iowa
State Penitentiary, Fort Madison,
Iowa, Appellee.

No. 2–59169.

Supreme Court of Iowa.

May 25, 1977.

John M. Thompson, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Thomas D. McGrane, Asst. Atty. Gen., Phil C. Redenbaugh, County Atty., for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, LeGRAND and UHLENHOPP, JJ.

RAWLINGS, Justice.

This is an appeal from denial of postconviction relief. In 1964, applicant, Merlin C. Long, on a guilty plea, was convicted of murder in the first degree and sentenced to life imprisonment. No appeal followed. In the present action applicant contends he was denied effective assistance of counsel, after arrest, because of failure on the part of an appointed attorney to properly advise him regarding his right to contest testimonial admissibility of a previously given confession, and to invoke the diminished mental capacity theory in event of trial. Postconviction relief was denied. We affirm.

The record before us includes the original criminal file; guilty plea proceedings; and depositions by several crime investigating officials and applicant's court appointed attorney in the original action. There is also at hand the postarrest report by a Bureau of Criminal Investigation (BCI) agent.

June 23, 1964, the badly mutilated nude body of a white female, later identified as Bonnie Jean Johnson, was found floating in a river, about two miles southeast of Peter-

son. She had been gagged by use of a brassiere and the deceased's hands were tied behind her back. The Buena Vista County Medical Examiner attributed the cause of death to loss of blood from a slit throat.

It appears the involved offense occurred on or about June 22, 1964, in Buena Vista County. Inquiry revealed the murder victim had been last seen alive on that date when she emerged from a Sioux Rapids tavern accompanied by an unidentified itinerant laborer and rode away with him in a green Volkswagon bearing Nebraska license plates. Upon receipt of this information, June 23, Buena Vista County Sheriff, Donald Barels, contacted hotel personnel where the suspected laborer had been staying and thereby ascertained his identity, i. e., Merlin C. Long, formerly an Omaha resident. Barels promptly dispatched a radio message to hold Long on suspicion of murder.

June 24, at approximately 12:15 a. m., he was apprehended. At about 1:15 a. m., some officials, including the BCI agent, began questioning the arrestee in a city council room adjacent to the Spirit Lake Police Department.

As a preface to his ensuing statement, Long acknowledged it was being given "of his own free will" and he had been offered use of a phone, but placed no call. There followed detailed questions and answers. Reduced to narrative form this is the salient part of Long's confession:

The officers ultimately told applicant he was in serious trouble and he could talk to either the sheriff or county attorney or the BCI agent alone. At this point Long asked, "Who is in charge?" The BCI agent advised Long that Barels was the sheriff in the county concerned and the BCI was assisting with the investigation. Long stated he would talk to both the sheriff and agent, then began telling about his activities the night of June 22, 1964.

He had been drinking some beer that evening in Sioux Rapids and met Bonnie Johnson at "Bud" Dennis' Tavern. They later decided to go fishing so left the tavern sometime between 10:00 and 10:30 p. m., in his 1962 Volkswagon. He drove Bonnie to her grandfather's residence in Sioux Rapids where she got her rod and reel. The two then went to Linn Grove, where they purchased some worms and fished for a short period of time in that area. They eventually moved to a secluded place further down the river.

Both had been drinking quite a bit and after arriving at the second location began fooling around with each other. He removed Bonnie's toreador pants and underpants but at this point Bonnie acted as though she did not want to have intercourse. While Bonnie was sitting with her feet over the bank, he struck her with an object along the right side of the head. He knocked Bonnie out, then ripped off her brassiere and used it as a gag. He also grabbed a piece of cord and tied her hands behind her back. After having tied the woman he pulled her blouse and sweater back over her arms, cut her breasts, stomach and hips and lastly cut her throat with his fishing knife. He then attempted to have intercourse with her and thereafter dumped the body into the river. Long thereupon threw the murder weapon and his tackle box into the water.

The authenticity of this confession is materially placed beyond the pale of doubt by testimony elicited from Dr. William E. Erps, Buena Vista County Medical Examiner, during the September 8, 1964, degree of guilt hearing. Dr. Erps' description of the body wounds corresponds with applicant's portrayal of his mutilating and death-causing acts.

Although there is some testimonial conflict regarding identity of those present when Long confessed, the postconviction court found applicant had been timely advised regarding his right to remain silent. Despite Long's assertion to the contrary, this finding is amply supported by the deposition of Jack H. Bedell, then Dickinson County Attorney.

July 20, applicant was arraigned on a first degree murder charge. At that time Attorney William Perry was appointed to represent the accused. He promptly entered a not guilty plea, and soon thereafter secured a copy of Long's confession which had been reduced to writing. Mr. Perry also requested and obtained a psychiatric evaluation of Long at state expense. This is, in material part, the report received by Mr. Perry after Long's examination at the State Psychopathic Hospital in Iowa City:

"We believe that he can assist in the preparation of his defense and that he knows the difference between right and wrong. Because of the intensity of his sexual deviation, he would tend to ignore the consequences of the acts at the time of the murder to which he admits. Whatever course should be decided by the Court in the handling of this case, it would be our opinion that this man is dangerous to society and should be confined under conditions of maximum security."

In an effort to further evaluate the situation attorney Perry several times telephoned Dr. Spencer, author of the above statement, and discussed with him a possible insanity defense. Mr. Perry also explored the possibility of employing Long's mental status as a mitigating factor or in connection with a diminished responsibility approach. By deposition attorney Perry stated he consulted applicant regarding an insanity defense but Long emphatically rejected a jury trial with attendant publicity or the injection of any issue as to his mental status. Applicant noticeably limits his response to the denial of any statement by Perry regarding diminished responsibility.

Perry also said he never urged Long to enter a guilty plea but rather discussed this and left it entirely with his client to make the choice.

September 4, applicant as defendant, appeared in court with appointed counsel and personally entered a guilty plea to the charge as made. Some evidence was introduced and the matter continued to September 8, when hearing was had on degree of guilt. September 14, the time fixed for sentencing, Long appeared with attorney Perry who presented evidence and strenuously urged his client be found guilty of no more than second degree murder. Trial court found Long guilty of murder in the first degree and imposed the above noted sentence.

By written brief applicant avers, "the only relevant factual disputes in this appeal are whether Mr. Long was advised of his right to challenge the admissibility of his confession and present the defense of diminished capacity and, if so, whether that advice was 'within the range of competence demanded of attorneys in criminal cases.'" During oral argument, however, we were also asked to determine whether applicant's plea was intelligently and voluntarily entered. Even though this last inquiry was belatedly voiced, we entertain same as it relates to other matters presently considered and resolved.

■ In light of the fact applicant has alleged the violation of basic constitutional safeguards, this court's evaluation will be premised upon totality of relevant circumstances shown by the entire record. In other words, our review is de novo. See *Jackson v. Auger*, 239 N.W.2d 180, 182 (Iowa 1976); *Hightower v. Peterson*, 235 N.W.2d 313, 316–317 (Iowa 1975); *Rinehart v. State*, 234 N.W.2d 649, 658 (Iowa 1975); *State v. Boren*, 224 N.W.2d 14, 15 (Iowa 1974).

I. Applicant initially asserts trial court erred by applying the outmoded "mockery of justice" standard in evaluating effectiveness of attorney Perry's pre-plea representations. In lieu thereof applicant contends Perry's conduct must be measured by that competency prevailing among those licensed to practice before the bar. See *United States v. Easter*, 539 F.2d 663, 665–666 (8th Cir. 1976); *Rinehart v. Brewer*, 421 F.Supp. 508, 516 (S.D.Iowa 1976).

■ *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), teaches that the right to counsel, assured federal defendants through the sixth amendment,

is a fundamental right guaranteed state court defendants through the fourteenth amendment due process clause. See *State v. Williams*, 207 N.W.2d 98, 104 (Iowa 1973); *State v. Kendall*, 167 N.W.2d 909, 910 (Iowa 1969).

■ Also, since *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), it has been generally understood a state defendant has the right not only to timely appointment of counsel, but also to assistance of an attorney whose quality of performance does not fall below a minimum level of effectiveness. See *McQueen v. Swenson*, 498 F.2d 207, 213 (8th Cir. 1974).

■ In other words, the right to counsel means effective assistance of an attorney. See *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); *Ogden v. State*, 215 N.W.2d 335, 337 (Iowa 1974); *State v. Williams*, 207 N.W.2d at 104.

Traditionally, this court accepted the widely quoted "mockery of justice" standard for evaluating effective assistance of counsel. That precept was thus ameliorated, however, in *Parsons v. Brewer*, 202 N.W.2d 49, 54 (Iowa 1972):

"In any event, effective assistance of counsel does not mean successful. Rather, it denotes conscientious, meaningful legal representation wherein the accused is advised of his rights and honest, learned and able counsel is accorded reasonable opportunity to perform his assigned task. Improvident trial strategy, miscalculated tactics, mistake, carelessness or inexperience do not necessarily amount to ineffective counsel."

■ Then came *McMann v. Richardson, supra,* followed by *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). In substance, the *Tollett* Court held that when a criminal defendant, on advice of counsel, has admitted in open court he is guilty of a charged offense, he may not thereafter raise independent claims relating to deprivation of constitutional rights antedating the plea. He may only attack the voluntary and intelligent character of the plea by showing counsel's advice was *outside the range of competence demanded of attorneys in criminal cases.* Iowa now follows the "range of normal competency" standard. See *Zacek v. Brewer,* 241 N.W.2d 41, 50–51 (Iowa 1976); *Wycoff v. State,* 226 N.W.2d 29, 32 (Iowa 1975), and citations.

■ It is readily apparent the postconviction court touched all bases in this regard. Illustratively, it found and concluded:

"After carefully reviewing this entire record, this Court is convinced that the pre-plea representation afforded Long by his attorney was not so inadequate as to 'make the proceedings a farce and a mockery of justice, shocking the conscience of the court.' [Citations]. Perry's representation of Applicant, clearly was not 'only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference and preparation.' [Citations]. *The Court finds the pre-plea advice well within the 'range of competence demanded of attorneys in criminal cases.'* " (emphasis supplied).

Trial court's overview of several standards by which to evaluate effective assistance of counsel is understandable in view of some possibly confusing, federal decisions in this area. See generally *Garton v. Swenson,* 417 F.Supp. 697, 707–730 (W.D.Mo.1976).

Be that as it may, we are persuaded trial court considered and in actuality applied the effectiveness of counsel yardstick now extant in this jurisdiction. Therefore, applicant's first assignment of error is without merit.

II. In light of the foregoing we are now called upon to determine whether applicant has established "an affirmative factual basis demonstrating counsel's inadequacy of representation". See *Zacek v. Brewer,* 241 N.W.2d at 51.

At the outset, a resolution of this problem is uncommonly complicated by reason of an unavoidably involved "swearing match" between applicant and, in large part, a lawyer who served under trying circumstances. See A. Bishop, "Federal Habeas Corpus in State Guilty Pleas", 71 F.R.D. 235, 253–254 (1976).

Long asserts his guilty plea was neither intelligently nor voluntarily entered because of inadequate advice by attorney Perry regarding admissibility of statements made by applicant soon after his arrest. He first argues Perry was unaware of *Escobedo v. State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (decided June 22, 1964), therefore, negligent in not considering that authority in order to properly evaluate the possibility of suppressing Long's postarrest statements.

■ Unquestionably, the burden was upon applicant to show ineffectiveness of his counsel and that the plea-related proceedings did not measure up to requisite fairness. See *State v. Kendall*, 167 N.W.2d at 910–911. See also *Scalf v. Bennett*, 260 Iowa 393, 400, 147 N.W.2d 860 (1967).

As stated in *Zacek v. Brewer*, 241 N.W.2d at 49, quoting from *United States v. Bluso*, 519 F.2d 473, 474 (4th Cir. 1975):

" 'The [Supreme] Court has placed a very heavy burden on one alleging incompetent advice, declining to find it even where both the defendant and his counsel were unaware at the time the plea was entered of substantial material facts or defenses. * * * While it is sometimes said that a waiver is a voluntary surrender of known rights, it may also be intended as a voluntary surrender of all rights, known and unknown. * * * [citing authorities]. A guilty plea is normally understood as a lid on the box, whatever is in it, not a platform from which to explore further possibilities.' "

*Zacek*, 241 N.W.2d at 48, also quoted this from *McMann v. Richardson*, 397 U.S. at 769–770, 90 S.Ct. at 1448–1449:

" 'As we said in *Brady v. United States*, 397 U.S. [742], at 756–757, 90 S.Ct. [1463], at 1473–1474, 25 L.Ed.2d 747, the decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. * * * [A] decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.'

" * * *

" 'In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases. * *.' "

Also noted is this apt statement in *Tollett v. Henderson*, 411 U.S. at 267–268, 93 S.Ct. at 1608:

"The principal value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client and such representation frequently involves highly practical considerations as well as specialized knowledge of the law. Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, see *Brady v. United States*, supra, 397 U.S. at 751–752, 90 S.Ct. at 1470–1471, or by contesting all guilt, see *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). A prospect of plea bargaining, the expectation or hope of a lesser sen-

tence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement, such as unconstitutional grand jury selection procedures, might be factually supported."

See also *State v. Cooper*, 161 N.W.2d 728, 730 (Iowa 1968).

■ Mindful of the foregoing and at cost of some repetition we again allude to the factual situation underlying applicant's ineffectiveness of counsel claim. In so doing trial court's well considered statement of facts is in part brought into play.

Long claims the questioning began at approximately 1:15 a. m., June 24, 1964. He maintains the interrogation was conducted solely by Sheriff Barels and special agent Voss throughout the time he made incriminating statements about the murder. These confessions, according to applicant, occurred at approximately 3:50 a. m. Applicant further claims he was never given his "rights" as required by *Escobedo.*

Applicant's position finds some facial support in Voss' January 24, 1975 deposition. It reveals Voss had little or no independent recollection of events regarding Long's interrogation or the substance of his report filed soon after the event. His testimony indicates, however, both he and Barels questioned Long; the three were alone in the room at time of the confession; and if somebody else had been present it would have been noted in his investigation report. Taken as a whole, the Voss deposition indicates no warnings of any kind were given to Long and the questioning spotlighted at once on Long as a murder suspect. This is virtually in direct conflict with the testimony of then Dickinson County Attorney Bedell and Sheriff Barels. Bedell's deposition was taken at the same time as that of agent Voss and is similarly indefinite in some respects. But Bedell recalls seeing Buena Vista County Attorney Skinner when he arrived at the Spirit Lake council hall. These two officials discussed impact of the recent *Escobedo* decision, according to Be-

dell. After discussing the instant case, Skinner and Bedell went to interview Long, immediately advised him to the effect he was a murder suspect and did not have to "tell us anything".

Bedell further states Long volunteered the incriminating information readily and he, Bedell, did not wait for the reporter's written statement, subsequently prepared. Bedell plausibly opined Long had not been questioned about the homicide before he and Skinner appeared on the scene. In fact, he was surprised when the suspect so readily voiced his confession.

Sheriff Barels also contradicted the Voss report in a March 25, 1975 deposition. Barels denied he and Voss began questioning Long immediately after arrest as to the murder. Instead, he indicated the three of them talked about immaterial matters while waiting for the county attorneys to complete some business in the outer room. Barels also denied Long was questioned about the involved death until after Skinner and Bedell had entered the room and informed applicant he did not have to say anything. This deponent also stated applicant did not admit the murder until Skinner and Bedell were present. He said the confession came a few minutes after the attorneys entered the room. Sheriff Barels also stated the Voss report was not accurate in all respects, particularly in that the confrontation with Long regarding his role in the crime took place after the county attorneys entered the room and had given the "right to remain silent" warning.

As aptly summarized by the presiding postconviction judge:

"The Court does not see in the Voss Report anything so inconsistent as to overcome the testimony of Bedell and Barels to the effect that Long was not questioned directly concerning his complicity in the crime until after the County Attorneys had entered the room and gave Long, in substance, the warnings required by *Escobedo.* * * * Moreover, Barels testified at the degree hearing concerning the interrogation of Long. This testimony clearly indicates that dur-

ing the initial interrogation the County Attorneys entered the room and participated in the questioning. Finally the Court finds it illogical to assume, as Applicant suggests, that the County Attorneys remained outside of the room while Long was being questioned for a period of approximately 2½ hours."

Mr. Perry started consultations with Long within a day after the appointment. This attorney also solicited known facts about the crime and related confession from applicant, Barels and Bedell. On the basis of these discussions, Perry concluded the confession had been freely and voluntarily given. Although Perry considered the possibility of moving to suppress the confession he did not believe there existed a meritorious basis for such a procedural tactic.

Perry explained elements of the crime to applicant and the State's burden in order to obtain a trial conviction. Attorney Perry was also satisfied Long understood he could have a jury trial, his right to then cross-examine State witnesses, and that he need not testify if the case went to a guilt determination hearing.

The attorney admitted, however, he was unaware of the June 22, 1964, *Escobedo* decision so did not consider it in evaluating the possibility of suppressing Long's confession. Applicant now contends failure to invoke this possible procedural maneuver resulted in ineffective assistance of counsel. We do not agree.

In the first place, *Escobedo* is readily distinguishable from the case now before us. Demonstrably, the *Escobedo* Court stated, 378 U.S. at 490–491, 84 S.Ct. at 1765:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer,* and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon v. Wainwright,* 372 U.S., at 342, 83 S.Ct., at 795, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (emphasis supplied).

See also *State v. Myers,* 258 Iowa 940, 943–945, 140 N.W.2d 891 (1966).

Noticeably, Long did not elect to exercise the given preinterrogation leave to use a telephone.

Furthermore, trial court correctly found applicant had been duly advised regarding his right to remain silent. More importantly, nothing in the record so much as intimates Long ever requested an opportunity to consult with an attorney at any time before or during the June 24 interrogation process.

Hence *Escobedo* would not have accorded Long the exclusionary force he now attributes to it.

Nor does this court impute to counsel such clairvoyance in June 1964, as to foresee *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Looking to another facet of the subject at hand, the Supreme Court considered retroactivity of both *Escobedo* and *Miranda,* in *Johnson v. State of New Jersey,* 384 U.S. 719, 734, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882 (1966), and there said:

"As for the standards laid down one week ago in *Miranda,* if we were persuaded that they had been fully anticipated by the holding in *Escobedo,* we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of *Escobedo,* however, have impelled us to lay down additional guidelines for situations not presented by

that case. This we have done in *Miranda*, and *these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966.*" (emphasis supplied).

Consequently, attorney Perry's proficiency must be measured by relevant 1964 precepts. In this vein *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 755, 9 L.Ed.2d 770 (1963), thus articulated the standard governing then existing testimonial admissibility of confessions: "If an individual's 'will was overborn' or if his confession was not 'the product of a rational intellect and a free will', his confession is inadmissible because coerced." See also *Brown v. Swenson*, 487 F.2d 1236, 1240 (8th Cir. 1973).

But nothing in the present record so much as indicates Long's statements were the product of either physical intimidation or psychological pressure. In fact, this statement by applicant at time of sentencing suggests just the opposite:

"If it's—if it's interesting to both parties, Don Barels, the Sheriff and deputy, and Mr. Ike Skinner and Mr. Voss * * * have treated me, I would say, excellent, considering, you know, the charge I am charged with; I really appreciate that, and all along have treated me real well, as bad as the thing is; murder. Just great the way they have treated me."

Additionally, attorney Perry testified he asked why Long had confessed and his reply was, "That's what happened."

Under existing circumstances, Mr. Perry's lack of knowledge as to the *Escobedo* holding, issued two days after Long's confession had been given, does not manifest such ineffectiveness of counsel as to tangentially place the stamp of involuntariness upon Long's freely given confession. Coupled with this it is to us apparent any attempt by Perry to seek refuge in *Escobedo* would have been at least subject to doubt and probably an exercise in futility. See *State v. Fox*, 257 Iowa 174, 178–179, 131 N.W.2d 684 (1964). In any event, the choice would have been a tactical judgment call, not instantly subject to retrospective condemnation. See *Tollett v. Henderson*

and *McMann v. Richardson*, both quoted *supra; Schleicher v. Wyrick*, 529 F.2d 906, 912 (8th Cir. 1976); *Franklin v. Wyrick*, 529 F.2d 79, 82 (8th Cir. 1976); *Parsons v. Brewer*, 202 N.W.2d at 54; *Scalf v. Bennett*, 260 Iowa at 399–400, 147 N.W.2d at 864.

In brief, the record reveals applicant's confessional statements were the product of a rational intellect and free will.

Long's second assignment of error is without merit.

III. Applicant next asserts his guilty plea was neither intelligently nor voluntarily entered because of inadequate advice by attorney Perry concerning the diminished responsibility theory. Long contends the record reveals his attorney neither appreciated the significance thereof nor discussed it with him in any meaningful way. See *People v. McDowell*, 69 Cal.2d 737, 73 Cal. Rptr. 1, 447 P.2d 97 (1968).

■ The diminished responsibility concept is not dependent upon an insanity plea. Rather, it permits proof of an accused's mental condition on the issue of capacity to form intent in those instances where the State must prove an accused's specific intent as an element of the crime charged. See *State v. Gramenz*, 256 Iowa 134, 138–139, 126 N.W.2d 285 (1964). See also *State v. Barney*, 244 N.W.2d 316 (Iowa 1976); Annot., 22 A.L.R.3d 1228.

As already observed, Mr. Perry, soon after his appointment, requested applicant be psychiatrically examined and the resulting reports stated: "[W]e believe that [Long] can assist in the preparation of his defense and that he knows the difference between right and wrong." From this statement, Perry concluded applicant would be found legally competent. This opinion was confirmed in the subsequent degree of guilt hearing when the author of the above stated report testified Long knew the difference between right and wrong at the time he committed the offense. See *State v. Thomas*, 219 N.W.2d 3, 5–6 (Iowa 1974). See also *State v. Lass*, 228 N.W.2d 758, 768–769 (Iowa 1975).

Then too, Perry discussed the report with Long but noted applicant was strongly opposed to *any* public inquiry as to his sanity. The attorney then counseled applicant as this dialogue reveals:

"Q. Now, had you discussed the premeditation requirements with Mr. Long before then? A. I had discussed it with him in this way: I had stated that I— Well, from the beginning I told him that I felt that due to his mental make up and what went with it, that I didn't feel that he could be charged and found guilty of this kind of a crime, but I said I can get no foundation backing from the professionals on this as an insanity defense under our laws that exist, but that he was still handicapped by this peculiar condition which afflicted him, and that he shouldn't get the extreme penalty of conviction of murder in the first degree; that I would so argue it to the Court, which I did.

"Q. When you said you didn't think he, given his mental status, couldn't be charged and convicted of first degree murder, let me ask you whether you felt that would be possible with a jury trial? A. No; I felt a jury would steam roll right over him—any jury.

"Q. So a jury would have just ignored or at least not given quite proper weight to the mental condition? A. No. In this kind of a case, it would shock the sensibilities; that a jury couldn't reach out and grasp for any kind of a conviction for anything except first degree, and would not come in with any lesser offense; it being a trial for the crime charged rather than on the question of insanity."

On applicant's hearing at time of sentencing Perry, as heretofore noted, presented testimony and argued Long should not be found guilty of first degree murder because of his mental state.

Applicant now urges, in essence, attorney Perry was wrong in considering Long's chances were better as to this theory before the judge as opposed to a jury. We are not so persuaded. The exhibits in this case reveal a gruesome crime was committed.

Perry concluded the technical diminished responsibility approach would probably find more ready acceptance by an impartial trial judge than in the hearts of lay jurors. See Annot., 22 A.L.R.3d at 1243. Moreover, applicant's insistence that his mental state be guarded from public view may have made any diminished capacity approach virtually impossible in a jury trial.

It must also be understood "effective assistance of counsel" does not mean every mistake in judgment or error in trial strategy by an attorney serves to deprive an accused of a constitutional right. See *Tollett v. Henderson,* quoted *supra.* See also *McMann v. Richardson,* 397 U.S. at 770–771, 90 S.Ct. at 1448–1449 (Waiving trial entails the inherent risk that the good faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts).

Finally, Long failed to show his erstwhile attorney's alleged mistake, if any, in assessing possible defense-related mechanisms, substantially prejudiced applicant's rights. See *Thomas v. Wyrick,* 535 F.2d 407, 414 (8th Cir. 1976).

Simply stated there is no basis upon which to reasonably conclude a jury would have found other than did the sentencing court on the instantly involved issue.

No reversible error attended applicant's ineffectiveness of counsel as related to his diminished responsibility contention.

IV. Applicant finally asserts defense counsel may have "considered" suppressing the confession or using the diminished capacity theory but these thoughts were not communicated to defendant. Consequently, says Long, his guilty plea was unintelligent and involuntary, thus unconstitutional, citing *Henderson v. Morgan,* 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). See also *Wallace v. State,* 245 N.W.2d 325, 327 (Iowa 1976).

In *Henderson,* the basic question presented was whether a defendant could enter a voluntary guilty plea to a charge of second

degree murder without being first informed that intent to cause death of the victim is an element of the offense. The Supreme Court held such a plea could not be voluntary because the defendant never received real notice of the true nature of the charge against him. Here, however, Long relies primarily on this statement in Justice White's concurring opinion, 426 U.S. at 650, 96 S.Ct. at 2260:

> "[I]t is too late in the day to permit a guilty plea to be entered against a defendant solely on the consent of the defendant's agent—his lawyer. Our cases make absolutely clear that the choice to plead guilty must be the defendant's: it is *he* who must be informed of the consequences of his plea and what it is that he waives when he pleads, * * * and it is on his admission that he is in fact guilty that his conviction will rest." (emphasis original).

Based thereon, Long now contends he was not fully informed to the effect his guilty plea waived the purported rights arising from diminished capacity and involuntary confession.

The facts presently under review are measurably distinguishable from those presented in *Henderson.* Significantly, the record clearly reveals Perry informed applicant as to (1) elements of the crime involved; (2) jury trial rights; (3) cross-examination privileges; (4) his right not to take the witness stand; and (5) consequences of a guilty plea. Thus applicant, as a preface to his guilty plea, was not denied "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Henderson v. Morgan,* 426 U.S. at 639, 96 S.Ct. at 2254.

Moreover, counsel did consult applicant regarding the confession, but concluded from these discussions a suppression motion would be futile. Similarly, although applicant contests this point, Perry tactically calculated the presentation of a diminished capacity theory would, as aforesaid, be accorded more weight by a judge than by a jury, and essentially so informed Long.

Finally, the record amply demonstrates Long had sufficient reasons, independent of the above considerations, to plead guilty. As trial court appositely observed this decision may have been based on any one or a combination of considerations irrespective of his confession, i.e., the strength of all evidence against him; the possibility of a death sentence imposed by jury verdict; his apparently strong desire to avoid publicity attendant upon a public trial; a compelling desire to shun public inquiry into the question of his mental status; or "simply that Long desired to admit commission of this crime to clear his conscience of the matter".

On point is this statement in *Brady v. United States,* 397 U.S. 742, 756–757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747 (1970):

> "Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. * * * [A] *voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.*" (emphasis supplied).

See also *Brown v. Swenson,* 487 F.2d at 1241.

In retrospect, it may be said Mr. Perry could have been more precise in advising

Long about the given confession and diminished capacity. It does not follow, however, counsel's conclusions as to these matters, and the discussion which culminated in a guilty plea, were so beyond the range of competence demanded of attorneys in criminal cases as to constitute ineffective assistance of counsel. By the same token attorney Perry's competency cannot be said to have been of such a low caliber as to negate the voluntariness of Long's guilty plea.

Applicant's last asserted assignment of error is devoid of substance.

Every contention presently advanced by Long in support of a reversal, whether or not discussed above, has been considered and found to be without merit.

AFFIRMED.

All Justices concur except LeGRAND, J., who concurs in the result.